An Order in accordance with the foregoing will be issued of even date herewith.

In re AMPICILLIN ANTITRUST LITIGATION.

AMERICAN MEDICORP, INC., et al., Plaintiffs,

v.

BRISTOL-MYERS COMPANY et al., Defendants.

Richard ESTEY d/b/a Rex Pharmacy, Plaintiff,

v.

BRISTOL-MYERS COMPANY et al., Defendants.

HOSPITAL DEVELOPMENT AND SERVICE CORP. et al., Plaintiffs,

v.

BRISTOL-MYERS COMPANY et al., Defendants.

KUTZA BROTHERS DRUGS, INC., et al., Plaintiffs,

v.

BRISTOL-MYERS COMPANY et al., Defendants.

LEE'S PRESCRIPTION SHOPS, INC., Plaintiffs,

v.

BRISTOL-MYERS COMPANY et al., Defendants.

MARK DRUGS, INC., et al., Plaintiffs,

v.

BRISTOL-MYERS COMPANY et al., Defendants.

SOL S. TURNOFF DRUG DISTRIBUTORS, INC., Plaintiffs,

v.

BRISTOL-MYERS COMPANY et al., Defendants.

M.D.L.No. 50.
Misc. 45-70.
Civ. A. Nos. 75-0035, 1159-70, 2453-70, 3355-70, 2452-70, 2544-70 and 3559-70.

United States District Court, District of Columbia.

Nov. 22, 1978.

396

Seymour Kurland, Judah I. Labovitz, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for plaintiff Sol S. Turnoff Drug Distributors, Inc.

David I. Shapiro, James van R. Springer, Dickstein, Shapiro & Morin, Washington, D. C., for the State of Alabama, et al.

Arnold Bauman, Robert P. Dobbin, Shearman & Sterling, New York City, Richard A. Whiting, Steptoe & Johnson, Washington, D. C., for Beecham Group Ltd.

Abraham L. Pomerantz, Stanley Grossman, Pomerantz, Levy, Haudek & Block, New York City, for plaintiff Richard Estey, d/b/a Rex Pharmacy.

Harold E. Kohn, Kohn, Savett, Marion & Graf, P. C., Philadelphia, Pa., for plaintiffs American Medicorp, Inc., et al.

Fredric B. Burns, Miami, Fla., for plaintiffs Lee's Prescription Shops, Inc., Hospital Development and Services Corp., Inc., and North Miami General Hospital.

Edward A. Berman, Chicago, Ill., for plaintiffs Mark Drugs, Inc., et al.

Harry Rubenstein, Chicago, Ill., for plaintiffs Kutza Bros. Drugs, Inc., et al.

Jerome G. Shapiro, Alan McLean, Hughes, Hubbard & Reed, New York City, for Bristol-Myers Co.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

The Court now has before it two petitions for attorneys' fees to be paid from the $7,930,000 fund created for the settlement of the claims of the plaintiff class composed of wholesale and retail druggists and nongovernmental hospitals in this litigation (the WRPH class). The first petition is that of the Committee of Counsel for the settling class (WRPH attorneys); the second is from the law firm of Dickstein, Shapiro and Morin. This partial settlement is the product of years of negotiation and preparation for litigation on behalf of this and other classes. Major claims on behalf of the United States government, the class composed of cities, counties, states and other political subdivisions, and the "competitor claims" of other drug companies are still pending.

On September 29, 1978, immediately after the presentation of evidence concerning the fairness of the settlement, the Court heard evidence and arguments in support of and in opposition to both fee petitions. Having heard no objection to the settlement, and having determined from the papers, the evidence, and the arguments of counsel, that the settlement was fair, reasonable, and adequate, the Court issued an order on October 20, 1978, approving the settlement.

The settlement funds will not be distributed to members of the settling class until the process of approval of a settlement plan, the audit of class members' claims, and the deduction of administrative ex-

398

penses from the fund is complete. However, counsel for this class and for other classes have worked long and hard in this litigation. Therefore, it seems only fair to make an interim fee and cost award to the Committee of Counsel for the class now, without prejudice to the supplementation of the award later in the settlement distribution process. In addition, the Court will preliminarily rule on the request for attorneys' fees of Dickstein, Shapiro and Morin, which has represented the non-settling plaintiff class composed of cities, counties, states and other public entities (the CCS class), and has served as liaison counsel to the private plaintiff classes throughout this litigation. The Dickstein firm's claim is now denied, but without prejudice to its resubmission at a later date and supplementation of the record in support of the request.

## I. BACKGROUND

### A. *The History of the Litigation*

This litigation commenced with the filing of the civil complaint of the United States Department of Justice on March 19, 1970. This complaint alleged that Bristol-Myers Company and the Beecham companies had violated Sections 1 and 2 of the Sherman Act in the manufacture, marketing and sale of ampicillin and other semisynthetic penicillin products. The complaint also challenged the validity of certain patents owned by the defendants, and the legality of certain agreements relating to those patents.

The federal complaint was followed by the filing of private treble damage actions in several jurisdictions. These included actions brought as class actions on behalf of various CCS plaintiffs, on behalf of consumers, and on behalf of wholesale and retail druggists and non-governmental hospitals, as well as claims filed on behalf of two competitor plaintiffs. By order of July 22, 1970, the Judicial Panel on Multidistrict Litigation transferred all of the cases to the District of Columbia for pretrial purposes. Other "tag-along" cases were later transferred here. The cases were originally assigned to Chief Judge Sirica, and were later reassigned to this Judge.

In his order of May 9, 1972, Judge Sirica certified the druggist and non-governmental hospital classes as well as the consumer and CCS classes. That order upheld the druggist and non-governmental hospital classes against the challenge of the United States as well as against the defendants. The order also designated the current WRPH Committee of Counsel for the druggist and hospital classes. The original class certification has withstood several challenges. The only major change in class composition was a recertification of the wholesale and retail druggist and non-governmental hospital classes as a single class to facilitate this settlement on June 28, 1978.

Discovery efforts have been spearheaded by the government and CCS attorneys. By 1972, a document depository was established in Washington, D. C. During 1973 and 1974, numerous discovery questions were referred to a Special Master, many of whose rulings have been appealed to the Court. As to the non-settling classes, deposition discovery has commenced only recently, and defendants are threatening further delay.

The first significant settlement discussions were initiated by counsel for other plaintiff classes and the Beecham defendants after the Court suggested "non-adversary conversations" at a status hearing of October 7, 1974. These discussions were geared toward a global settlement. After several false starts, an *ad hoc* plaintiffs' negotiating committee was appointed with the consent of all parties on August 8, 1975, which included Mr. David Shapiro, as chairman, and Messrs. Freeman, Kurland, Grossman, Rubenstein, Burns, Kohn, Desiderio, and Dunne. This committee, counsel for the United States, defense counsel, and their principal clients, met in the Court's jury room beginning on September 29, 1975, to work out a complete settlement. By October 15, 1975, Beecham had agreed to offer $5.5 million, and Bristol to offer $21 million, making a total settlement package offer of $26.5 million for the settlement of all cases.

The global settlement proposed by October 15, 1975 ultimately failed when plaintiffs were unable to agree upon the allocation of the fund among themselves. The United States agreed to accept $8 million in satisfaction of its damage claims. By the time the plaintiffs had agreed among themselves as to the division of the remaining $18.5 million in the spring of 1977, the defendants had decided to withdraw their offers. Since that time, negotiations have been geared toward partial settlements.

The Supreme Court's decision in *Illinois Brick Company v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), drastically affected the postures of all parties in these discussions. That decision was undoubtedly a primary impetus for this separate settlement. Through the elimination of the passing-on defense, *Illinois Brick* magnified the dollar value of the WRPH class claims based on direct purchases, at the expense of the claims of other plaintiffs which were based only on indirect purchases. As a direct result of that decision, the consumer claims were dismissed by this Court's order of July 5, 1978. This increase in the relative significance of the druggist and private hospital claims apparently convinced the defendants that separate WRPH settlements would significantly reduce their exposure to damage claims. On April 16, 1978, Bristol offered $6 million for settlement of the claims based on both direct and indirect purchases of the WRPH classes. On June 16, 1978, Beecham offered $1.93 million for a similar settlement with the WRPH class.

### B. *The Settlement*

The terms of the Beecham and Bristol-Myers settlements are virtually identical. The aggregate settlement fund is $7,930,000, which has earned and will continue to earn interest at the prime rate from September 1, 1978, until the fund is distributed to class members. By the time of distribution, the aggregate sum may approach $11 million. At the time the settlement was being negotiated, Congress was actively considering legislation to overrule *Illinois Brick*. This pending legislation threatened to revive the claims of WRPH class members based on indirect purchases. Therefore, the settlement agreements provide for the discharge of these claims at ten per cent of the rate allowed for direct purchases.

A preliminary hearing to determine the fairness of the proposed settlement was held on June 16, 1978. Pursuant to the Court's orders of June 28, 1978, and July 5, 1978, notice of the settlement was sent by direct mail to approximately 80,000 class members. In addition, notice was published in industry periodicals and in Wall Street Journal. The notice included information as to the rights of class members to participate in, object to, or opt out of the settlement. In addition, it indicated that expenses to be deducted from the settlement fund would amount to approximately $75,000, and that fees of $1,550,000 would be requested by counsel for the settling class.

The reaction of the class to the settlement has been overwhelmingly favorable. By the time of the final settlement hearing on September 29, 1978, not a single objection to the settlement by a class member had been received, nor has there been any objection by class members to the WRPH attorneys' fee petition. This lack of opposition to the settlement seems especially significant in light of the fact that large and presumably sophisticated businesses have sought to share in the settlement without objection. Had there been any doubt as to the adequacy of the settlement or the class representation, these class members were in a position to protect their interests.

As provided in the settlement agreements and in the Court's order of October 20, 1978, approving the settlements, the Committee of Counsel will be responsible for the administration and distribution of the settlement to class members under the Court's supervision. Mr. Kurland, who has thus far acted as the Committee's representative with regard to communications with class members, has indicated that major problems in settlement distribution will probably involve the late filing of claims and the lack of documentation for claims filed. The Court is not yet informed as to the exact

total dollar value of damage claims that have been filed, nor of the precise proportions of those claims based on direct and indirect purchases. In addition, the ultimate cost and time required for settlement distribution remain estimates. The Court cannot yet determine the precise percentage at which class members' damage claims will be reimbursed. The WRPH Committee of Counsel has agreed to discharge its further responsibilities in connection with the settlement administration without claiming additional attorneys' fees. However, the uncertainties which remain are among the reasons why the Court has determined to make only an interim award at this time and to hold open the question of the Dickstein firm's claim.

## C. *The WRPH Attorneys' Fee Petition*

The Committee of Counsel for the WRPH class now seeks a joint fee of $1,550,000 from the settlement fund. The Committee has also applied for $33,246.95 for out-of-pocket expenditures.

The fee now sought by the Committee is based upon the affidavits of committee members as to their usual non-contingent rates multiplied by the aggregate number of hours spent by each attorney on this litigation during the past eight years. No agreements have existed between these attorneys and any of the representative plaintiffs for any fees other than any the Court might award after the successful prosecution or settlement of the litigation. Representation of the class has therefore been wholly on the basis of a possible Court award of fees and costs. As previously stated, the attorneys have indicated that no additional fee will be requested for their work in administering the settlement, which they estimate will require another 350 hours.

It has also been represented to the Court that these attorneys have bound themselves to a plan for the allocation among themselves of any fees awarded by the Court. Since the fee application purports to be based upon the rates and time spent by the several attorneys, it is pre-

sumed that these factors also weigh heavily in this internal agreement. However, it is recognized that the allocation among counsel must depend at least in part upon the more subjective factors of the relative contributions of the attorneys to the group effort. In the context of this litigation, which has extended over an eight-year period, it is virtually impossible for the Court to determine as accurately as can the attorneys themselves the internal distribution of work, responsibility and risk. Since it is the unanimous position of these attorneys, all of whom are able and of substantial experience, that the Court should take no part in the ultimate division of any fee awarded, and since the Court is cognizant of its own limitations in fairly estimating the work done by each attorney, the Court will defer to the attorneys' request that the fee award be made to the Committee of Counsel as a whole, and will not inquire further into the agreement among the attorneys. Nevertheless, the Court is also painfully aware that the application for and award of attorneys' fees in this manner injects an additional element of uncertainty into an already indefinite process. This has been taken into account in the Court's determination of the appropriate weight to be given to its computation of a lodestar factor and its increase in this figure to account for risk and result in the settlement of this phase of the litigation.

## II. DISCUSSION

Virtually every judicial statement of the factors to be considered by a trial court in awarding attorneys' fees in class action cases has its genesis in the trend set by the *Lindy Bros.* cases (*Lindy Bros. Bldrs., Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir. 1973) (*Lindy I*) and 540 F.2d 102 (3d Cir. 1976) (*Lindy II*)). The *Lindy* cases require the initial determination of a "lodestar" factor based upon the hours actually spent on the case, multiplied by the normal non-contingent hourly fees for the attorneys involved. The amount thus objectively determined may then be adjusted by the

trial court to account for more uncertain factors, such as the risk of the litigation, the contingency of the representation, and the result obtained. This circuit has adopted the *Lindy* approach. *See National Treasury Employees Union v. Nixon,* 172 U.S. App.D.C. 217, 222, 521 F.2d 317, 322 (1975); *Kiser v. Miller,* 364 F.Supp. 1311 (D.D.C. 1974) *aff'd sub nom. Kiser v. Huge,* 170 U.S.App.D.C. 407, 517 F.2d 1237, *aff'd en banc,* 171 U.S.App.D.C. 1, 517 F.2d 1275 (1974).

The Court will first consider the application of the WRPH attorneys. First, it will determine the number of hours appropriately spent on the case and the non-contingent hourly rates of the attorneys involved. By multiplying these factors it will calculate the lodestar figure. Thereafter, the risks of litigation and contingent nature of the representation, as well as the result obtained for the class, will be considered. The fee awarded is based upon the lodestar figure plus an appropriate increase based upon these less objective considerations.

### A. *The Factors Considered*

1. The Lodestar Factor: The Hours Spent and the Usual Hourly Rates.

Members of the WRPH Class Committee of Counsel claim to have spent a total of 6335.83 hours on the ampicillin litigation since its inception eight years ago. The affidavits submitted in support of the application are based, with one exception, upon contemporaneous time records. All of the hours claimed by the attorneys have been used in the Court's calculation of the lodestar figure. Uncertainties with respect to the hours logged have been taken into account in the Court's exercise of its discretion in increasing the lodestar.

Counsel have broken down the hours logged by each attorney into hours spent on preparation of pleadings, discovery, class certification issues, briefing of substantive antitrust issues, court appearances and settlement negotiations. Some Courts have allowed different billing rates for individual attorneys on the basis of hours spent engaged in different activities. The Court

has used these breakdowns only to document the necessity of their activities in this litigation. Any attempt to do otherwise would have been particularly unrewarding in light of the joint nature of this application. While each attorney has broken down his activities into several categories, each of the six law firms joining in the application has described the activities included in each category differently. Any order requiring the attorneys to categorize the activities so logged according to a uniform system at this late date would result in a procrustean exercise which could hardly be expected to produce more reliable data.

■ The affidavit of Mr. Berman includes among his total of 405 hours spent on this litigation 25 hours allocated to "general and miscellaneous time." Mr. Walner has similarly included 43.6 hours spent on "other miscellaneous" activities among the 352.1 total hours he claims. Such time records would normally be considered inadequate by this Court. However, the number of hours so allocated by the attorneys is very small in proportion to the total number of hours each has spent on this litigation. Moreover, the Court recognizes that, over the course of litigation which has been in progress for eight years, a certain amount of time must have been spent on the case which does not readily fit into the categories listed in the fee applications. Therefore, these hours will be considered to have been appropriately accounted for and will be included in the calculation of the lodestar factor.

■ The affidavit of Mr. Pomerantz indicates that the total hours his firm claims to have spent on this litigation are based in part upon reconstruction of the attorneys' activities rather than upon contemporaneous time records. Prior to 1973, Mr. Pomerantz avers, his firm maintained no such records, since they were generally not required by the courts in awarding fees in actions of this type prior to the *Lindy* cases. The affidavit indicates that the firm has carefully reconstructed the hours spent prior to 1973 from diary entries, correspon-

dence, and a "total review of all the papers in the matter." Fee applications based upon similar reconstructions for periods prior to the *Lindy* and *Grinnell* mandates have recently been approved in *In re Master Key Antitrust Litigation*, 1978–1 Trade Cases ¶ 61,887 at 73,725 (D.Conn.1978). Therefore, despite the fact that the Pomerantz affidavit contains no breakdown of the hours claimed on the basis of contemporaneous time records and those based on reconstructions, the Court will accept the affidavits of the attorneys as to the time actually spent on the case.

The "usual rates" quoted by the several attorneys in their affidavits submitted in support of the fee application range from $40 to $250 per hour. Theoretically, these are the rates charged by these attorneys when they bill non-contingent clients. However, the attorneys' methods of calculating their rates cannot have been uniform.

Several of the most eminent of the attorneys, who were active in the class representation, have quoted rates substantially lower than those of other attorneys joining in the application, and lower than those frequently awarded to attorneys of their calibre in such litigation. Additionally, the majority of these attorneys work primarily for court-awarded fees, so that their rates are generally fixed by the courts.

The rates used are based upon *current* normal rates, despite the fact that the services were provided over an eight-year period. This use of current rates simplifies the Court's task and roughly counterbalances the inflationary loss suffered by the attorneys because of the long delay in the recovery of their fees. *See Master Key Antitrust Litigation, supra* at 73,720.[1] Generally, the rates quoted by the attorneys are within range approved for the same attorneys in similar cases. *See Arenson v. Chicago Board of Trade*, 372 F.Supp. 1349 (N.D.Ill.1974); *Miller v. Fisco*, 1978 Sec. Law Rep.R. ¶ 96,348 (E.D.Pa.1978). In all but a few instances, the Court has adopted the rates requested by the attorneys in computing the lodestar figure.[2]

The Court has used the following rates and hours to determine its lodestar figure:

| Attorney | Hours | Rate | Total Value of Hours * | Firm Total |
|----------|-------|------|------------------------|------------|
| Berman | 405 | $100 | $ 40,500 | |
| Walner | 352 | 100 | 35,200 | $ 75,700 |
| Kohn | 232.75 | 200 | 46,550 | |
| Savett | 9 | 125 | 1,125 | |
| Marion | 3 | 125 | 375 | |
| Kaplan | 7.25 | 75 | 543.75 | |
| Stiefel | 20.25 | 50 | 1,012.50 | 49,606.25 |

1. In *Parker v. Califano*, 443 F.Supp. 789 (1978), this Court awarded higher fees for more recent work than for work performed three years earlier, specifically because of inflation. To determine the appropriate current rate, the Court multiplied the attorney's 1975 hourly rate by the current Gross National Product deflator factor for 1975.

2. The Court will reduce the rates of $250 per hour requested by attorneys Kohn and Sager, which seem excessive as normal rates. It may be that the normal rates used by these attorneys were awarded by courts in contingency fee cases. In the *Arenson* case, *supra*, Mr. Kohn's normal rate, prior to the contingency increase, was set at $125 per hour. In that case, Mr. Pomerantz' rate was set at the same rate. Mr. Pomerantz now uses $200 per hour as his normal rate. Since the rate for all the attorneys will actually be much higher when increased by the contingency factor, it seems fair to fix normal rates for Messrs. Kohn and Sager at $200 per hour.

Mr. Walner has not indicated his normal billing rate in his affidavit. Therefore, the Court will set his normal rate as that of his partner, Mr. Berman. The two attorneys have been awarded identical fee rates by other courts. *See Arenson, supra.*

The affidavits of the Wolf, Block, Schorr firm include 17 paralegal hours. In light of the Court's experience with such fees, the rate of $35 per hour requested for these workers is excessive. The Court will use a rate of $15 per hour as the normal rate for paralegals.

| Attorney | Hours | Rate | Total Value of Hours* | Firm Total |
|---|---|---|---|---|
| Pomerantz | 321.25 | $200 | $ 64,250 | |
| Haudek | 11.50 | 175 | 2,012.50 | |
| Meyers | 5.50 | 140 | 770 | |
| Grossman | 664.50 | 110 | 73,095 | $140,127.50 |
| Rubenstein | 1,938.33 | 125 | 242,291.25 | 242,291.25 |
| Burns | 995 | 100 | 99,500 | |
| Sager | 53 | 200 | 10,600 | 110,100 |
| Kurland | 241 | 137 | 33,017 | |
| Labovitz | 570.50 | 125 | 71,312.50 | |
| Podwil | 331.25 | 95 | 31,468.75 | |
| Strogatz | 9 | 89 | 801 | |
| Schwartz | .25 | 76 | 19 | |
| Stern | 83.50 | 40 | 3,340 | |
| Paralegals | 17 | 15 | 255 | 140,213.25 |
| Totals | 6,270.83 | | | 758,038.25 |

* Hours × Rate

The lodestar figure used by the Court, based upon the chart above, is $758,038.25.

### 2. The Risks of Litigation and the Contingent Nature of the Fee

By definition, all the attorneys involved on the basis of possible Court-awarded fees in this eight-year litigation have assumed enormous risks. The difficulty of proof of damages based upon the theory of basic market structure manipulation through the use of allegedly illegally obtained patents and agreements relating to them has increased the time and risk commitment required of the attorneys. It seems clear to the Court, however, that the WRPH attorneys have reduced their proportionate share of the risk by relying to some extent upon other plaintiffs' attorneys for much of the substantive case preparation.

Attorneys for the government plaintiffs and the several plaintiff classes have worked collectively on most discovery and substantive issues throughout this litigation. Counsel for the current settling class have necessarily relied to some extent upon the effective work of the Antitrust Division of the Department of Justice and its lead counsel, Mr. Thomas Liddle, and the CCS counsel where the interests of their clients have coincided. However, at key points in the litigation, the interests of the several plaintiff groups have diverged. In regard to these issues, the predecessors of the current settling class were aligned in opposition to other plaintiffs. Particularly in regard to class certification issues and defendants' motions to dismiss based on the pass-on theory, WRPH counsel have vigorously asserted the discrete interests of their clients.

The WRPH attorneys and their clients have benefited from the state of ferment over the past eight years in the class action and antitrust fields. The decision in *Illinois Brick Company v. Illinois, supra,* has been of great benefit to the WRPH class and its attorneys. As a direct result of the elimination of the pass-on defense by this decision, the claims of the class increased several times in dollar value. This augmentation of the class claims meant that these attorneys, who had thought they were working for a share of a smaller potential recovery, could look to a much larger potential sum for their award. Nevertheless, prior to the *Illinois Brick* decision, these attorneys withstood challenges to their clients' claims based upon the Supreme Court decisions in *Zahn v. International Paper Company,* 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973) and *Eisen v. Carlisle and Jacquelin,* 417 U.S.

156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). In addition, they resisted attempts of attorneys considering the 1975 global settlement offer, to allocate to the WRPH plaintiffs a small share of the fund. The risk created by the contingencies of this litigation have thus been substantially shared by the WRPH attorneys.

### 3. *The Result Obtained*

The fund produced for the benefit of the class in this settlement is $7,930,000. This represents a recovery of over one third of the class attorneys' estimate of $22,000,000 as the greatest possible damages that could be proved by the class. In light of the undoubted complexities in this case, this sum, which will be even larger at the time of distribution, represents an excellent achievement on behalf of the class. Although earlier settlement negotiations undoubtedly contributed to this settlement, attorneys for this class ultimately achieved this recovery through independent negotiations. All counsel for the class are hereby complimented collectively and individually.

### B. *The WRPH Fee Award*

The fee of $1,550,000 sought by these attorneys would result in payment for all the attorneys' hours included in the fee applications at a mixed rate of about $250 per hour, which would constitute an award of about 19 per cent of the total settlement sum. Such an award would result in an award which is a multiple of just over two times the Court's lodestar figure of $758,038.25. This rate falls within or below the normal range of 20 to 30 per cent of the class recovery for fee awards in this type of litigation.[3]

The less objective considerations of risk and result weigh more heavily in the Court's assessment of this fee application than would be the case under normal circumstances. The lodestar figure which is the starting point for this fee award is especially unreliable in this case. First, the fact that this is only a partial settlement makes it difficult, if not impossible, for the Court to determine the extent to which the work that benefited this class was done by these attorneys rather than the attorneys for other plaintiffs, and the extent to which the work done by these attorneys benefited classes other than their own. Settlement negotiations prior to 1975, and substantive case preparation and discovery after that date, were undertaken collectively by all the plaintiffs' attorneys. The Court has been aware that some duplication has occurred.

Additional uncertainties inhere in the joint nature of this application. In addition to the unavoidable duplication, the logging of hours by the six law firms cannot have been uniform in terms of the classification of activities and expectations as to efficiency. In addition, since the Court has agreed

---

3. This "normal range" estimate appears in Herbert B. Newberg, 3 *Newberg on Class Actions*, Supp. September 1978, at 86. A few examples of fees awarded as estimated by Mr. Newberg are as follows:

*Arenson v. Board of Trade of Chicago*, 372 F.Supp. 1349 (N.D.Ill.1974): $35 to $125 per hour noncontingent rates. Four times hourly rate awarded, up to $500/hour; average of $359/hour.

*In re Gypsum Cases*, 386 F.Supp. 959 (N.D.Cal.1974): $30 to $100 per hour noncontingent rates and $15 per hour paralegal. Range of multiples up to three times hourly rates; lead counsel awarded $300 per hour.

*Miller v. Fisco*, 1978 Fed.Sec.L.Rep. 96,348 (E.D.Pa.1978): securities: $50 to $250 per hour noncontingent rates and $25 per hour paralegal. Three times hourly rate awarded, up to $750 per hour; $300 per hour mixed rate.

*City of New York v. Darling-Delaware, Inc.*, 440 F.Supp. 1132 (S.D.N.Y.1977): $50 to $175 per hour noncontingent rates. Multiples up to two times current hourly rate despite earlier rates in earlier 7 years of litigation.

*Dorfman v. First Boston Corp.*, 70 F.R.D. 366 (E.D.Pa.1976) (securities): $50 to $75 noncontingent hourly rates plus $20 per hour paralegal and $15 per hour law student.

*Fried v. Utilities Leasing Corp.*, 1976–77 Trans. Binder CCH Fed.Sec.L.Rep. 95,695 (E.D.Pa.1976): $75 to $250 noncontingent hourly rates. Four times hourly rate justified; award of 25 per cent of $1,000,000 fund, plus 25 per cent interest earned on settlement fund until its distribution.

Also see: *Berkey Photo Inc. v. Eastman Kodak Co.*, 73 Civ. 424 (MEF), (appeal pending) (S.D.N.Y.August 8, 1978): $63 per hour mixed rate. No increase for contingency.

not to interfere in the attorneys' division of this joint award among themselves, it will have no assurance that any individual attorneys will receive payment for work at the rates and hours on which the total award is based.

Although the fee requested by these attorneys appears to be a relatively modest percentage of the settlement fund, this Court must protect the class from an excessive fee award. The lodestar figure on which this award is based may be inflated because of the joint nature of the application in the partial settlement context. Furthermore, it is clear that the value of the damage claims of the settling class increased following the *Illinois Brick* decision, which must also have increased the expectations of these attorneys as to their fees after most of their services were rendered.

■ While the excellent result obtained on behalf of the class justifies a substantial increase in the lodestar figure, the Court is not now prepared to award the full amount requested by the attorneys. Instead, a joint fee of $1,140,000 will be awarded at this time. This represents a multiple of about 1.5 times the Court's lodestar figure. In light of the uncertainty of that figure, the award may well constitute a greater multiple of the hours justifiably spent by these lawyers on the litigation. The overall rate at which all the attorneys' hours will be awarded is about $181 per hour. Nevertheless, the Court will retain jurisdiction over this fee application and will consider a request to supplement this fee award later in the settlement distribution process. The final fee award to these attorneys may approach or equal the sum requested.

In addition to the fee award, the Court finds that the request of the WRPH attorneys for $33,246.95 reimbursement for cost disbursements is adequately documented and reasonable. This request is therefore granted.

## C. *The Dickstein, Shapiro and Morin Fee Application*

The law firm of Dickstein, Shapiro and Morin has applied for an award of attorneys' fees from this settlement fund in the amount of $211,112.50. The Dickstein firm is counsel for 20 city, county, and state (CCS) plaintiffs in this litigation and for the CCS classes represented by 17 of those plaintiffs. In addition, the firm has acted as liaison counsel for all private plaintiffs since the Court's original class certification order of May 9, 1972. The firm claims to have acted as "de facto" lead counsel for all private plaintiffs. The firm has not formally represented the WRPH classes in this litigation. A memorandum in support of the application was submitted by California and Oregon, both of whom are members of the CCS class.

The application is based on the theory that the firm has conferred a benefit upon the WRPH classes through its efforts on behalf of all the classes throughout this litigation. The sum requested is one-half of the value [4] (at the firm's 1975 non-contingent rates), of the time spent by Dickstein attorneys prior to October 15, 1975 on services which they consider to have redounded to the benefit of all the plaintiffs. No fees are requested for any time spent after October 15, 1978, the date on which the plaintiffs received a global settlement offer of $26.5 million. At that time, the interests of the WRPH plaintiffs and the Dickstein firm's clients diverged, since each group sought a larger share of the global settlement sum. No increase is sought for the contingency and quality of the work.

■ The Court has no doubt that it has power to award fees from this settlement to the Dickstein firm. This is consistent with the general equitable power of the courts to require parties to contribute to the fee of an attorney whose efforts have benefited those parties. *See Altman v. Central of Georgia Ry.*, 176 U.S.App.D.C. 326, 540 F.2d 1105 (1976); *Bakery & Confectionery*

---

4. The fifty per cent figure is derived from the firm's determination that "the interest of the WRPH classes appears, under present circum-

stances, to represent approximately one-half of the collective interests of all the plaintiffs." (*Dickstein Application*, at 31.)

*Workers International Union v. Ratner*, 118 U.S.App.D.C. 269, 335 F.2d 691 (1964); *Doherty v. Bress*, 104 U.S.App.D.C. 308, 262 F.2d 20 (1958). In the context of global settlements in antitrust cases such as this one, the Courts have awarded attorneys' fees from the funds of all classes found to have benefited from the attorneys' services, without regard to the fact that the attorneys are not the formal representatives of those classes. *See In re Master Key Antitrust Litigation, supra*; *In re Gypsum Cases*, 386 F.Supp. 959 (N.D.Cal.1974); *Alpine Pharmacy v. Chas. Pfizer & Co.*, 481 F.2d 1045 (2d Cir.), *cert. denied, Patlogan v. Dickstein, Shapiro and Galligan*, 414 U.S. 1092, 94 S.Ct. 722, 38 L.Ed.2d 549 (1973).

Nevertheless, the Dickstein application, in its current form, is inadequate to support a fee award from this class settlement. As already noted, the application is based on an approximation of the value of the firm's services to these plaintiffs prior to the 1975 global settlement offer. It seems clear to the Court that the WRPH classes have benefited to some degree from the efforts of the Dickstein firm in the preparation of the litigation on the merits and in the settlement initiatives that culminated in the 1975 global offer. It is beyond question that the current settlement is, at least in part, the product of the 1975 settlement package. Furthermore, the Dickstein firm's preparation of the case on the merits must have contributed to the ability of all plaintiffs to win many substantial concessions from the defendants. Nevertheless, the award is sought from the WRPH settlement, which was ultimately separately negotiated by the attorneys for that class. The contribution toward the current settlement of the Dickstein firm's efforts which resulted in the earlier settlement simply cannot be accurately determined from the information now available to the Court.

■ The Dickstein firm has attempted to estimate the value of the firm's pre-1975 services to these plaintiffs by allocating a proportionate share of the firm's overall efforts in this litigation to these plaintiffs. The estimated proportion is derived from these attorneys' estimate of the proportion the current settlement reflects of the ultimate aggregate recovery of all the plaintiffs in this litigation. After years of discovery and negotiations, these attorneys undoubtedly have a good sense of the relative value of the claims of the various plaintiffs. However, no evidence has been offered to indicate that the relative values of the plaintiffs' current claims, or of their proportionate shares of the ultimate total recovery, is an appropriate measure of the relative value of the classes of legal services rendered at least two and one half years before the current partial settlement. This method of allocation of *past* services based upon the value of current or future claims is especially suspect in light of the dramatic shift in posture of the several plaintiff classes after the *Illinois Brick* decision.

Other courts faced with similar applications have refused to award fees based upon such rough approximations. In particular, the court in *Dorfman v. First Boston Corp.*, 70 F.R.D. 366 (E.D.Pa.1976), refused to exercise its discretion to compensate attorneys in one case who had represented other plaintiffs in the multi-district litigation from which that case had been severed, but who represented no plaintiff in the settling case. In addition, the Court of Appeals for this Circuit has recently mandated the careful scrutiny by the trial courts of fee requests in the employment discrimination field. See *Copeland v. Marshall*, No. 77–1351 (D.C.Cir. October 30, 1978). However, this Court, while aware of the need for precision in attorneys' fee awards, is concerned with a potential chilling effect on the vindication of societal rights by attorneys who work for court-awarded fees.

This Court is troubled by the record in support of the fee request of the Dickstein firm. However, as indicated in the first part of this opinion, this Court is not so naive as to suppose that any attorney's fee application in litigation as complex and long-lived as this can really be precisely analyzed. The Court is reluctant to deny a fee altogether to a firm which has contrib-

uted so substantially and effectively to this litigation in general. In addition, an outright denial of this fee application would burden the CCS classes, which have been formally represented by the Dickstein firm, with the cost of services which have benefited other classes. Therefore, the current fee application of the Dickstein firm will be denied, but without prejudice to its supplementation and resubmission at a later date, to permit a more precise allocation of the fee burden among the classes.

## III. CONCLUSION

The attorneys in this litigation have served for eight years with no compensation. The Court feels that they are entitled to a prompt ruling on their applications for fees from this settlement fund. Therefore, the Court is now awarding $1,140,000 to the Committee of Counsel for the WRPH class, to be divided among the attorneys pursuant to their independent agreement. (See Letter of Stanley M. Grossman of October 23, 1978, Attachment A.) In addition, the Court now awards the WRPH attorneys $33,246.95 to reimburse them for their out-of-pocket expenditures up to the time of the fee application. Today's award is made without prejudice to the possible grant of all or a portion of the balance of the pending fee request at a later date. Finally, the fee petition of Dickstein, Shapiro and Morin is denied, but without prejudice to its supplementation and resubmission at a later date.

An order in accordance with the foregoing will be issued of even date herewith.