105 F.3d 469
 65 USLW 2473, 97 Cal. Daily Op. Serv. 416,
97 Daily Journal D.A.R. 681
 In re FPI/AGRETECH SECURITIES LITIGATION.
Thomas W. HAYES, Agretech Trustee, Plaintiff,
v.
Karl HAUSHALTER; Ernest & Young, Defendants.
LIEFF, CABRASER & HEIMANN, Applicant-Appellee,
v.
Jamie CHUCK; Chuck, Jones & MacLaren, Applicants-Appellants.
 No. 95-15134.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 13, 1996.
Decided Jan. 17, 1997.
 
 Mark D. Bernstein, Honolulu, HI, for applicants-appellants.
 Richard M. Heimann, Morris A. Ratner, Lieff, Cabraser & Heimann, San Francisco, CA, for applicant-appellee.
 Appeal from the United States District Court for the District of Hawaii, Manuel L. Real, Chief District Judge, Presiding. D.C. No. MDL-00763.
 Before SNEED, PREGERSON, and KOZINSKI, Circuit Judges.
 SNEED, Circuit Judge:
 
 
 1
 In this attorneys' fee dispute, we are asked to assess the propriety of the district court's refusal, first, to approve an attorneys' fee allocation proposal between class co-counsel; and second, to award fees at all to one counsel, applicant-appellant Jamie Chuck. Because we find the district court's decision to be reasonable under the circumstances, we affirm the judgment.
 
 I.
 BACKGROUND OF THE FEE DISPUTE
 
 2
 A syndication of partnerships established to cultivate and sell tropical plants in Hawaii collapsed financially in 1987. As a result, several thousand investors who had purchased limited partnership interests in the venture lost, collectively, over $50 million. Naturally, litigation followed. Several class actions charging securities fraud were filed against FP Investments, Inc. ("FPI"); its several subsidiaries; the company which was supposed to cultivate the plants, Agricultural Research and Technology Group, Inc. ("Agretech"); and several accounting and law firms that had facilitated the sales of interests to investors.
 
 
 3
 Chuck, representing four named plaintiffs and a proposed class of several thousand investors, filed the first of the actions in federal district court for the district of Hawaii in September 1987. The other actions were ultimately transferred to the District of Hawaii under 28 U.S.C. § 1407, consolidated as MDL 763, and assigned to Judge Real. Judge Real appointed Chuck and Lieff Cabraser & Heimann ("LCH") co-lead and co-liaison class counsel.[1]
 
 
 4
 The legal team for the consolidated plaintiff class was, however, effectively expanded beyond LCH and Chuck as a result of early efforts by LCH. LCH had filed declaratory judgment actions in bankruptcy court in Hawaii against the FPI and Agretech bankruptcy estates, seeking a determination of whether the investor class or the bankruptcy estates would have standing to pursue claims against third parties such as accountants and attorneys. These actions led to a Sharing Agreement between the class and the bankruptcy trustees, which was approved by the bankruptcy court over Chuck's objections. Under this Agreement, which enabled the class and the trustees to litigate cooperatively instead of fighting amongst each other, any funds recovered by the class or the trustees from their claims against the defendants would be pooled and allocated two-thirds to the investor class, two-ninths to the Agretech trustee and one-ninth to the FPI trustee.
 
 
 5
 Thus, the team of attorneys included the Agretech trustee's attorney, Paul, Johnston, Alston & Hunt ("PJAH") and the FPI trustee, attorney Steven Guttman. The attorneys agreed, in November 1988, on a division of responsibilities under which LCH would assume primary responsibility for developing the case against the law firms of Cades Schutte Fleming & Wright ("Cades") and Wyman Bautzer Kuchel & Silbert ("Wyman Bautzer") (collectively, the attorney defendants), and Chuck would assume primary responsibility for developing the case against defendants associated with Arthur Young & Co. ("Arthur Young") and Coopers & Lybrand ("C & L") (collectively, the accountant defendants). (The responsibilities assigned to PJAH and Guttman are not important to an understanding of the issues in this appeal.)
 
 
 6
 Four months later, LCH and Chuck switched responsibilities. In a "Joint Prosecution Agreement" signed in March 1989, Chuck agreed to take over the case against the attorney defendants, while LCH agreed to pursue the accountants.[2]
 
 
 7
 Discovery proceeded on parallel tracks, each attorney collecting documents and witnesses for their respective cases. The record indicates that Chuck successfully gathered, catalogued, and analyzed thousands of documents that enabled her to effectively depose several key witnesses and oppose two summary judgment motions by the attorney defendants. Therefore, she clearly helped to set the stage for a favorable settlement.
 
 
 8
 However, when settlement negotiations began with the Cades and Wyman Bautzer defendants, it was LCH that took the lead. Ultimately, Chuck appears to have played little role in the negotiations, which were supervised by Judge Tevrizian and led to the attorney defendants settling for an aggregate of nearly $12 million.[3]
 
 
 9
 After the district court approved these settlements in October 1990, it made an interim award of attorneys' fees according to the attorneys' stipulation. The stipulation allocated fees among the attorneys according to their respective lodestars (the number of hours spent multiplied by a reasonable hourly rate), and was made "[s]ubject to any future court order concerning fees" and "solely as an advance against the final total award of fees to the applicants." The court order, however, omitted the above-quoted language, simply awarding 25% of the settlement fund in attorneys' fees and allocating the fees according to the attorneys' stipulation--$1,293,987 to LCH; $815,727 to Chuck; $663,388 to PJAH; and $131,016 to Guttman.
 
 
 10
 It is undisputed that at this point in the case, Chuck's work ended. LCH continued to develop the case against Arthur Young (C & L having settled by an earlier agreement not at issue in this appeal), took the case to trial, and won a jury verdict against the accounting firm in August 1990. Although Chuck apparently offered to help with this part of the case, she ultimately did not. Nonetheless, when the district court awarded an aggregate attorneys' fee of 35% of the Arthur Young judgment in December 1990, Chuck filed an application for an allocation of fees from that award.
 
 
 11
 The record indicates that LCH hotly disputed Chuck's right to a portion of the fees from a judgment which she had done nothing to help obtain. However, at a January 28, 1991, hearing on the matter, LCH asked Judge Real to place the fee dispute at the end of his calendar while the attorneys worked out a compromise "on the courthouse steps." The compromise they reached, which Elizabeth Cabraser of LCH presented to Judge Real for his consideration, would have allocated 57.5% of the award to LCH, 23% to PJAH, 18.5% to Chuck, and 1% to Guttman. It is this agreement which Chuck here argues Judge Real should have accepted.
 
 
 12
 Rather than accepting the proposal, however, the district judge reacted negatively to it, apparently for three reasons. First, the court was concerned that "we may be jumping the gun on this" because it remained to be seen who would do what work on the Arthur Young appeal. Second, the court felt that the agreement was "overly generous to Ms. Chuck." Finally, the court decided that the Sharing Agreement between the class and the trustees required it to send the estates' one-third share of the fund to the bankruptcy court and to let the bankruptcy judge award attorneys' fees to the trustees' attorneys from that share. The court ordered the matter taken off calendar until the appeal was resolved, retaining jurisdiction to award fees and costs at that time.
 
 
 13
 The Arthur Young appeal, in which Chuck concededly did not participate, took four years to resolve. Ultimately, LCH negotiated a $17 million settlement with that defendant. Chuck then filed, in November 1994, a second application for an allocation of attorneys' fees from that fund, and LCH applied for an allocation of the entire award to itself. At a December 8, 1994, hearing, Judge Real reiterated his feeling that Chuck was not entitled to share in the fees generated by litigation to which she had not contributed. Therefore, the court granted LCH's application for the entire fee award of 35% of the class' two-thirds share of the judgment, and denied Chuck's application. Chuck timely appealed. We have jurisdiction over the appeal under 28 U.S.C. § 1291.
 
 II.
 STANDARD OF REVIEW
 
 14
 In class actions, the district court has broad authority over awards of attorneys' fees; therefore, our review is for an abuse of discretion. Class Plaintiffs v. Jaffe & Schlesinger, P.A., 19 F.3d 1306, 1308 (9th Cir.1994). This deference extends to the court's choice of method--lodestar or percentage recovery--for calculating the award.[4] In re Washington Pub. Power Supply Sys. Sec. Litig., 19 F.3d 1291, 1296 (9th Cir.1994). The "district court abuses its discretion if its decision is based on an erroneous conclusion of law or if the record contains no evidence on which it rationally could have based its decision." Paul, Johnson, Alston & Hunt v. Graulty, 886 F.2d 268, 270 (9th Cir.1989).
 
 III.
 DISCUSSION
 
 15
 A. The Rejection of the Fee Allocation Proposal
 
 
 16
 Chuck's first argument on appeal is that the district court abused its discretion by rejecting the fee allocation proposal presented by the attorneys at the January 1991 hearing. She contends, first, that the only proper bases for rejecting a fee agreement are where the agreement is contrary to the interests of the class or inconsistent with standards of professional conduct; and second, that the agreement should have been treated as an enforceable contract. We disagree.
 
 
 17
 1. Bases for Rejecting a Fee Allocation Agreement.
 
 
 18
 There is very little case law concerning the allocation of attorneys' fees among co-counsel. That which does exist indicates that district courts may refuse to accept a fee allocation agreement whenever there is good cause to do so. For example, in Smiley v. Sincoff, 958 F.2d 498, 501 (2d Cir.1992), the Second Circuit affirmed the district court's rejection of a fee agreement between two attorneys. The court explained:
 
 
 19
 A district court's exercise of this broad discretion to review and modify a fee agreement is not limited to situations in which it finds windfall, adverse class impact, or other irregularity. Whenever a court finds good reason to do so, it may reject an agreement as to attorneys' fees just as it may reject an agreement as to the substantive claim.
 
 
 20
 Id. (internal quotations omitted). So long as the district court provides a "concise but clear explanation" of its reasons, and those reasons are supported by the record, the reviewing court should accept its decision. Id. at 502.
 
 
 21
 The cases relied upon by Chuck are not to the contrary. In In re "Agent Orange" Prod. Liab. Litig., 818 F.2d 216, 222 (2d Cir.), cert. denied by Newton B. Schwartz, P.C. v. Dean, 484 U.S. 926, 108 S.Ct. 289, 98 L.Ed.2d 249 (1987), the Second Circuit refused to honor a fee sharing agreement among class counsel on the ground that the agreement was inconsistent with the interests of the class because it might encourage premature settlement. The court rejected authority that "allows counsel to divide the award among themselves in any manner they deem satisfactory under a private fee sharing agreement. Such a division overlooks the district court's role as protector of class interests ... and its role of assuring reasonableness in the awarding of fees in equitable fund cases." Id.; see also Jaffe, 19 F.3d at 1308 ("It is well established that an award of attorneys' fees from a common fund depends on whether the attorneys' specific services benefited the fund--whether they tended to create, increase, protect or preserve the fund.") (internal quotation omitted). Thus, this case supports the proposition that a court may reject a fee allocation agreement where it finds that the agreement rewards an attorney in disproportion to the benefits that attorney conferred upon the class--even if the allocation in fact has no impact on the class.
 
 
 22
 In Prandini v. National Tea Co., 557 F.2d 1015, 1019 (3d Cir.1977), overruled on other grounds, Ashley v. Atlantic Richfield Co., 794 F.2d 128 (3d Cir.1986), the Third Circuit affirmed the district court's refusal to approve an agreement to pay a percentage of the fee to referring counsel: "[A] division of fees based on a percentage without regard to work performed or responsibility assumed is not in compliance with the ABA standard." Id. at 1019. Like In re Agent Orange, this case supports the proposition that district courts have the authority to reject a fee allocation that does not accurately reflect the amount of work performed by the various attorneys.
 
 
 23
 The record before us indicates that the district court rejected the proposal because it did not reflect the relative work performed by Chuck and LCH. Most illuminating are the district judge's comments at the January 1991 fee hearing:
 
 
 24
 I don't know how much work is going to yet be done by people in the Arthur Young case, and by whom it's going to be done.... I'll give it to you right now--I think it's overly generous to Ms. Chuck, this spread.... I don't want it to redound to the detriment of the law firm that, at least that I think, is probably entitled [to] a lion's share of the fee, simply because that case was tried. And that's the law firm that, in effect, won that case without an awful lot of help from anybody else.... I don't want anybody--anybody, again, also, very frankly--I don't want anybody just sitting back and profiting from what's going to happen on appeal. Because what you're doing is, you're increasing--you're increasing the thing.... And what you earned for the class is something that ought to be considered by the Court in hard terms, and not just on some ephemeral kinds of settlements.... I don't think that [Chuck] made that much of a contribution to this--the Arthur Young matter at all. I don't think there was a hell of a contribution to either Wyman Bautzer or Cades, since it was Judge Tevrizian who settled that case. Not Ms. Chuck. It was Judge Tevrizian who settled that case. And he gave me the details of it.
 
 
 25
 We reject Chuck's proposed rule that a district court may decline to approve a fee allocation only if it is contrary to the interests of the class or in violation of rules of professional conduct. Instead, we hold that the relative efforts of, and benefits conferred upon the class by, co-counsel are proper bases for refusing to approve a fee allocation proposal. See Jaffe, 19 F.3d at 1308; In re Agent Orange, 818 F.2d at 223.
 
 
 26
 2. The Fee Allocation Proposal as Contract.
 
 
 27
 Chuck next argues that the district court should have treated the fee allocation proposal as an enforceable contract. However, the cases on which Chuck relies are inapposite. See Stissi v. Interstate & Ocean Transport Co. of Philadelphia, 814 F.2d 848 (2d Cir.1987); Joye v. Heuer, 813 F.Supp. 1171 (D.S.C.1993), aff'd, 66 F.3d 316 (4th Cir.1995). Neither case involved attorneys' fees in a class action, and such fees derive from principles of equity, not contract. See Boeing Co. v. Van Gemert, 444 U.S. 472, 478, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980) (attorneys' fees in common fund cases are allowed by virtue of an equitable exception to the American rule that prevailing parties are not awarded attorneys' fees). More importantly, both cases involved formal fee agreements, whereas here the parties merely submitted orally a fee allocation proposal, arrived at, figuratively speaking, "on the courthouse steps," for the court's approval. We decline to curb the district courts' broad discretion in exercising their equitable power to award attorneys' fees in common fund class actions by requiring that fee allocation proposals be treated as enforceable contracts.
 
 
 28
 B. The Use of Different Methods in Calculating the Two Awards
 
 
 29
 Chuck argues next that the district court abused its discretion by using the lodestar method to award interim attorneys' fees from the settlement fund in 1990, and the percentage recovery method to award attorneys' fees from the Arthur Young judgment in 1994. This argument lacks support in both the facts and the law.
 
 
 30
 As a factual matter, both fee awards were effectively (if not explicitly) made on a percentage recovery basis. In its 1990 order, the court awarded 25% of the settlement fund in attorneys' fees. The attorneys, in a stipulation submitted to the court, agreed among themselves on an allocation of that 25%, calculated on a pro rata basis according to their respective lodestars.[5] The court accepted the allocation without comment. In its 1994 order, the court awarded in attorneys' fees 35% of the class' two-thirds of the judgment against Arthur Young. The attorneys agreed among themselves on an allocation of that 35%, but this time the district court refused to accept it.
 
 
 31
 Thus, the court in both instances awarded attorneys' fees according to the percentage recovery method, a decision that was well within its discretion. See In re Washington, 19 F.3d at 1295-96 (district court has discretion to use either lodestar or percentage recovery method in common fund cases); Six Mexican Workers v. Arizona Citrus Growers, 904 F.2d 1301, 1311 (9th Cir.1990) (same). When awarding attorneys' fees, courts must give primary consideration to "the fundamental principle that fee awards out of common funds be reasonable under the circumstances." In re Washington, 19 F.3d at 1296 (internal quotation omitted). Neither party argues that either the 1990 or 1994 award (of 25% and 35% respectively) was unreasonable. Therefore, the only question is whether the district court was unreasonable in refusing to allocate any attorneys' fees to Chuck in 1994.
 
 
 32
 C. The District Court's Refusal to Award Fees to Chuck
 
 
 33
 As a preliminary matter, Chuck argues that the district court abused its discretion by failing to articulate reasons for refusing to grant her fee application. See Hensley v. Eckerhart, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983) (district court is required to "provide a concise but clear explanation of its reasons" for a fee award); Smiley, 958 F.2d at 502 (same); Graulty, 886 F.2d at 270 (district court abuses its discretion if the record contains no evidence on which it rationally could have based its decision). That argument is unpersuasive here, where the district court held fee hearings in 1991 and 1994, and clearly articulated its concerns at both hearings.
 
 
 34
 The district judge's comments at the two hearings indicate that he felt the first attorneys' fee award in 1990 compensated Chuck for the discovery and motions work she had done to prepare the case against the Cades and Wyman Bautzer defendants, as well as for any other work she had done in the case.[6] That award also compensated LCH for its work preparing for, participating in, and successfully completing the settlement with the Cades and Wyman Bautzer defendants, as well as for its discovery work in preparing the case against the accountants, and for its function throughout the litigation as the liaison with class members.
 
 
 35
 The second attorneys' fee award in 1994 compensated LCH for its multi-year prosecution of the case against Arthur Young, including jury trial, appeal, and ultimate settlement.[7] Chuck does not argue that she was involved in this stage of the case. Rather, she argues that "[LCH] was permitted to share in the common fund generated by reason of the settlements achieved in the portion of the case for which [Chuck was] primarily responsible, while [Chuck was] excluded from a share in the common fund generated by reason of the settlement achieved in that portion of the case for which [LCH] was primarily responsible."
 
 
 36
 This argument is without merit because it ignores the record evidence that, regardless of primary responsibility, LCH was far more involved than Chuck in the actual settlement of the case against the attorney defendants, while Chuck was not at all involved in litigating the case against Arthur Young. Because of that evidence, it is both just and reasonable that LCH shared in the fees from the first settlement fund, while Chuck did not share in those from the second. See Jaffe, 19 F.3d at 1308 (district court should award attorneys' fees from a common fund according to whether attorneys' services benefited the fund).
 
 
 37
 Although it would have been preferable for the district court to explain its reasons for its decision in its written order, we find no abuse of discretion because the court explicitly expressed its reasons during two hearings on the issue. The record, moreover, fully supports the conclusion that Chuck was adequately compensated for her role in the case by the 1990 award, and that she was not entitled to share the fees generated by the Arthur Young litigation. Therefore, we hold that the district court's denial of Chuck's fee application was a proper exercise of its discretion.
 
 D. The District Judge's Comments
 
 38
 Chuck argues lastly that several of the district judge's comments at the January 1991 hearing amounted to an abuse of discretion. She alleges that Judge Real, by commenting that the fee proposal was overly generous to Chuck, encouraged LCH to ask for an allocation of the entire award, thus prejudicing Chuck. We disagree. Repeatedly, district judges must steer between the rocks of saying too little and those of saying too much. In this instance the passage was successful. Judges are not prohibited from commenting on the merits of the arguments and proposals before them.
 
 
 39
 Chuck also alleges that the district judge's comment concerning his discussion with Judge Tevrizian--"It was Judge Tevrizian who settled that case. And he gave me the details of it."--demonstrates an improper reliance on off-the-record evidence in reaching his decision, and therefore constitutes clear error. We disagree. Judge Tevrizian was asked to supervise the settlement negotiations with the Cades and Wyman Bautzer defendants. See Manual for Complex Litigation (3d) p 23.11 at 167 (transferee judge may bring in another judge or other neutral person to supervise settlement negotiations). Since it was Judge Real's responsibility to award appropriate attorneys' fees, it was quite proper for him to ask the settlement judge for his assessment of the attorneys' roles.
 
 
 40
 The cases on which Chuck relies for her argument are inapposite. Most disapprove instances where the district judge privately interviewed witnesses or experts. See People v. Archerd, 3 Cal.3d 615, 91 Cal.Rptr. 397, 477 P.2d 421 (1970); People v. Murray, 11 Cal.App.3d 880, 90 Cal.Rptr. 84 (1970). In Jorstad v. IDS Realty Trust, 643 F.2d 1305, 1311 (8th Cir.1981), the Eighth Circuit found an abuse of discretion where the district judge, in awarding attorneys' fees in a class action, relied principally on his own knowledge of the nature of the work involved, the experience of class counsel, and attorneys' hourly rates in the area. Here, by contrast, the district judge relied on a conversation with a judge who had been assigned to help settle parts of the case. That reliance was not clear error; indeed, it reflected the type of management and coordination envisioned by the rules governing complex litigation.
 
 
 41
 Moreover, the record contains other evidence that Chuck did not ultimately play a big role in the Cades and Wyman Bautzer settlements, even though she had been quite involved with the discovery process. See supra Parts III.A, C. Therefore, the district judge's decision is supportable even excluding his reliance on the settlement judge's assessment.
 
 IV.
 CONCLUSION
 
 42
 It may well be that one attorney or another bears the blame for the conflicts that developed between co-lead counsel in this litigation, and for the diminution of Chuck's role therein. However, we are not called upon to peer more deeply into that question. Whatever the reasons for the ultimately unequal division of work between LCH and Chuck, the record before us amply supports the district court's conclusion that Chuck was not entitled to a share of the fees from the Arthur Young judgment. The order awarding attorneys' fees is therefore
 
 
 43
 AFFIRMED.
 
 
 44
 KOZINSKI, Circuit Judge, dissenting.
 
 
 45
 Agreements between lawyers allocating fees for services rendered to joint clients are contracts. See Freeman v. Mayer, 95 F.3d 569, 572-74 (7th Cir.1996); Stissi v. Interstate & Ocean Transp. Co., 814 F.2d 848, 851-852 (2d Cir.1987); Joye v. Heuer, 813 F.Supp. 1171, 1173 (D.S.C.1993), aff'd, 66 F.3d 316 (4th Cir.1995). As such they require no judicial imprimatur to make them legal.
 
 
 46
 There are only two situations where judicial intervention is appropriate. First, where the division of fees is grossly disproportionate to the services actually provided, the allocation may represent an illegal payment for something other than services rendered to the client, such as a referral. See, e.g., Prandini v. National Tea Co., 557 F.2d 1015, 1019 (3d Cir.1977), overruled on other grounds, Ashley v. Atlantic Richfield Co., 794 F.2d 128 (3d Cir.1986). We can dispose of this possibility easily. At the time the parties reached their agreement, they were in an adversarial position. Each had made claims to a larger share of the class fee, yet they compromised for the usual reasons: to avoid the uncertainty, cost and delay of having the issue adjudicated. This situation is far different from that contemplated by the rules of professional responsibility, which prohibit cozy agreements between one lawyer who does all the work and another who merely makes a referral. See Model Code of Professional Responsibility DR 2-107(A)(2).
 
 
 47
 Judicial supervision is also warranted when the agreement sets the total amount of a fee award. This reason for judicial intervention defines its own outer boundaries: An application for attorney's fees from a common fund has no natural enemies, so judicial oversight is necessary to protect the interests of the class. To the extent an allocation between lawyers would increase the fees taken from the class, or in some other way prejudice class interests, judicial intervention is entirely appropriate. See 7B Charles A. Wright et al., Federal Practice and Procedure § 1797, at 340-41 (1986) ("The purpose of [Fed.R.Civ.P. 23(e) ] is to protect the nonparty members of the class from unjust or unfair settlements...."); In re "Agent Orange" Prod. Liab. Litig., 818 F.2d 216, 222 (2d Cir.) ("The ultimate inquiry ..., in examining fee agreements and setting fee awards under the equitable fund doctrine and [Rule] 23(e), is the effect an agreement could have on the rights of a class."), cert. denied, 484 U.S. 926, 108 S.Ct. 289, 98 L.Ed.2d 249 (1987).
 
 
 48
 But there is no justification for rewriting a bona fide fee allocation agreement where the contract will have no impact on the interests of the class. I recognize the Second Circuit allows such judicial meddling, see Smiley v. Sincoff, 958 F.2d 498, 501 (2d Cir.1992); Agent Orange, 818 F.2d at 223, but nothing in our own caselaw requires us to follow this unwise course. The only Ninth Circuit case cited by the majority, Class Plaintiffs v. Jaffe & Schlesinger, P.A., 19 F.3d 1306 (9th Cir.1994), concerned an individual lawyer's application for fees from a common fund, not a contract dividing a pre-set award. Id. at 1308 ("It is well established that an award of attorneys' fees from a common fund depends on whether the attorneys' 'specific services benefitted the fund ....' " (quoting Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp., 540 F.2d 102, 112 (3d Cir.1976))). Jaffe therefore provides no authority for the majority's rule, which allows district courts to substitute their judgment for that of the contracting parties.
 
 
 49
 Lawyers, no less than any others, are entitled to arrange their affairs by private contract. This policy is particularly strong where the contract in question memorializes the settlement of a dispute. We generally encourage parties to resolve their differences amicably, as they did here, so there must be very cogent reasons for upsetting an amicable resolution. That the agreement was entered into, as the majority figuratively puts it, "on the courthouse steps," maj. op. at 474, does not strike me as a compelling reason: Many binding agreements are reached on those steps or even in the courthouse lobby. Proximity to the bench seems to me like a good reason for enforcing these contracts, because it is more likely that parties to such agreements will understand the gravity and consequences of their actions.
 
 
 50
 Nor is Judge Real's perception that Chuck did little or no work in the case a sufficient reason for denying enforcement of the contract. The parties to the agreement were well aware of the legal and factual basis for their respective positions, and chose to settle by giving Chuck almost a fifth of the award. It is inconceivable that experienced lawyers like those of Lieff, Cabraser would give up such a large chunk of their fee unless they thought Chuck might persuade the judge to give her even more. Of course, she reasonably believed the opposite-which is what ensures that the agreement fairly approximates the work actually done by the various lawyers.
 
 
 51
 This is not an agreement entered into under duress; it is not a contract of adhesion; there was no showing of fraud; the parties were not minors or morons. All were well aware of the facts and law underlying their respective claims; they acted on the advice of counsel. There is no reason for failing to hold the parties to the deal they made. As we have said before, "Wise or not, a deal is a deal." United Food & Commercial Workers Union v. Lucky Stores, Inc., 806 F.2d 1385, 1386 (9th Cir.1986).
 
 
 
 [1]
 Chuck was initially appointed as part of a team with attorney Godfrey L. Munter. Munter was later removed from the case for reasons that are not important here, but Chuck remained. She later secured the help of Alexander T. MacLaren of Chuck Jones & MacLaren, also an appellant here
 
 
 [2]
 The reasons for this switch are unclear. LCH asserts that Munter and Chuck were unwilling to spend funds on expert witnesses and that the Agretech trustee, with whom LCH had a longstanding working relationship, was dissatisfied with Chuck's work in developing what he considered to be the most important part of the case. Chuck asserts that she was told that her performance had nothing to do with it, and claims that LCH was simply unwilling to undertake what everyone agreed was the far more difficult case against the attorney defendants. In either event, what matters for our purposes is only that LCH and Chuck did switch roles in March 1989, and that each claims to have derived little or no benefit from the other's discovery efforts prior to that time
 
 
 [3]
 Why Chuck was not more involved in these negotiations is, as with many aspects of this case, murky. While Chuck accuses LCH of making a "naked power play" in taking control of the settlement discussions with Wyman Bautzer, LCH retorts that Chuck abandoned her duties. With regard to Cades, Chuck claims that she participated in the two settlement meetings that she knew about, and was deliberately excluded from the others
 
 
 [4]
 Under the lodestar method, the court first multiplies the number of hours an attorney reasonably spent on the case by a reasonable hourly rate; that figure is then adjusted according to the circumstances of the case to reach a reasonable fee. Paul, Johnson, Alston & Hunt v. Graulty, 886 F.2d 268, 272 (9th Cir.1989). Under the percentage recovery method, the court awards the attorneys a percentage of the fund recovered by the successful litigation sufficient to give them a reasonable fee. In re Washington Pub. Power Supply Sys. Sec. Litig., 19 F.3d 1291, 1294 n. 2 (9th Cir.1994)
 
 
 [5]
 The settlement fund was created as follows:
 Cades Defendants $ 5,700,000
FPI Insider Defendants $ 650,000
Wyman Bautzer Defendants $ 4,850,000
Interest Earned through 9/14/90 $ 416,471
Total Settlement Fund $11,616,471
25% of Total Settlement Fund $ 2,904,118
The attorneys agreed on an allocation of the 25% as follows:
 Pro Rata
 Lodestar Percent Allocation
LCH $1,897,728 44.56% $1,293,987
Chuck $1,196,324 28.09% $ 815,727
PJAH $ 972,909 22.84% $ 663,388
Guttman $ 192,144 4.51% $ 131,016
 $4,259,105 100.00% $2,904,118
 Stipulation For Order Awarding Interim Attorneys' Fees.
 
 
 [6]
 Judge Real stated at the December 8, 1994, hearing: "Well, she got eighteen [sic] hundred and fifteen thousand dollars for that.... That was the consideration[ ] that went into that work for all that everybody gave me at the time."
 
 
 [7]
 Judge Real stated at the January 28, 1991 hearing: "I don't want it to redound to the detriment of the law firm that, at least that I think, is probably entitled [to] a lion's share of the fee, simply because that case was tried. And that's the law firm that, in effect, won that case without an awful lot of help from anybody else. At least from my observation of it."