**James T. STRONG, et al.**

v.

**BELLSOUTH
TELECOMMUNICATIONS, INC.**

**Civil Action No. 93–0999.**

United States District Court,
W.D. Louisiana,
Alexandria Division.

March 12, 1997.

Robert E. Couhig, Jr., Lisa L. Maher, Alex E. Cosculluela, Adams & Reese, New Orleans, William Robert Coenen, Jr., Office of William R. Coenen, Rayville, Camille F. Gravel, Jr., Alexandria, for Plaintiffs.

Ronald W. Tweedel, BellSouth Corp., Atlanta, GA, John Hoychick, Jr., Cotton Bolton Hoychick & Doughty, Rayville, Edward H. Bergin, David G. Radlauer, R. Patrick Vance, Jones Walker Waechter Poitevent Carrere & Denegre, New Orleans, Herschel L. Abbott, Jr., BellSouth Telecommunications, Atlanta, for Defendant.

## RULING

LITTLE, Chief Judge.

The parties jointly ask this court to approve a $1.5 million payment from defendant to plaintiffs' counsel[1] for attorneys' fees and costs, adding to the $4.5 million previously awarded by other courts. The requested fee is grossly disproportionate to the results obtained by plaintiffs' counsel. For the reasons that follow, the request for attorneys' fees and costs is DENIED in its entirety.

As we previously approved the settlement of this matter in all respects except for attorneys' fees and costs, our approval of the settlement is now final and this case is DISMISSED.

### I. Procedural and Factual Background

Plaintiffs are five customers of defendant BellSouth Telecommunications, Inc. ("BellSouth"). Plaintiffs' class action complaint alleged that they were duped into paying for a BellSouth inside wire service maintenance plan that they neither requested nor needed.

Plaintiffs' counsel filed companion class action suits against BellSouth in Louisiana state court, the Southern District of Alabama, Alabama state court, the Southern District of Mississippi, Mississippi state court, and the Eastern District of Tennessee.

After a trial before a magistrate in the Eastern District of Tennessee resulted in a

1. A number of attorneys have appeared for the plaintiffs in the Louisiana litigation as well as in the related Mississippi, Alabama, and Tennessee disputes. The attorney group has been largely, if not exclusively, led by the New Orleans based firm Adams & Reese.

hung jury, the parties reached a global settlement (hereafter the "Agreement"). Under the terms of the Agreement, a class member could claim a credit for his local telephone service over a 24–month period if the member selected to opt out of BellSouth's inside wire maintenance service plan. The amount of the available credit varied by state: Louisiana and Mississippi, $0.80 a month; Alabama. $0.60 a month; and Tennessee, $0.50 a month. The Agreement provided for the creation of a $64.5 million common fund to pay the credits requested by class members. The Agreement also provided that BellSouth would pay an additional $6 million directly to plaintiffs' counsel for fees and costs.

To be enforceable the Agreement required court approval in all four jurisdictions pursuant to Rule 23(e) of the Federal Rules of Civil Procedure. The Mississippi, Alabama and Tennessee federal courts approved the Agreement in whole. We rejected the Agreement after a full hearing and complete review, finding that the attorneys' fees award was excessive.

Following further discussion with the parties and the amendment of the Agreement, on 4 January 1996 we approved the Agreement, except for the attorneys' fees and costs. We retained jurisdiction to determine the quantum of compensation to be paid to plaintiffs' counsel pertaining to the Louisiana litigation, and requested information concerning the distribution of class benefits in all states.

We have reviewed the supplemental information introduced by the parties concerning the value of the claims actually submitted by class members. The parties now request approval of the attorneys' fees and costs payment pursuant to Rule 23(e).

Plaintiffs' counsel seeks $6 million from BellSouth for costs and attorneys' fees for the collective four-state litigation. Of this total, $4.5 million was previously approved by our sibling courts. We must decide if an additional payment of $1.5 million is reasonable. This amount represents the Louisiana share of the costs and fees, calculated by dividing the total fee request into four equal parts. Plaintiffs' counsel did not differenti-ate costs and fees among the states because of the overlap in the suits.

## II. Findings of Fact

This case settled after substantial discovery was conducted and after a trial on the merits in a companion Tennessee case resulted in a hung jury. It involved complex factual and legal issues. and the parties faced uncertainty as to how they would be resolved.

We find that counsel on both sides were competent and experienced in class action cases. Settlement negotiations were conducted without obvious collusion or fraud.

All class members were afforded the opportunity to opt out of the class. The opt out procedure was employed effectively by 498 class members.

Plaintiffs' counsel claim to have expended nearly 21,000 hours and $652,546.98 in costs prosecuting this case in four states. Local Louisiana counsel expended an additional 218 hours. Counsel charged hourly rates of $175 for partners, $250 for trial counsel, and be exact, that record time and money employed by plaintiffs' counsel. We have examined the records and have raised questions concerning some of the entries. Counsel have admitted that some of the submissions are in error. Nonetheless, we are not holding that the time employed is clearly compensable time. Assuming, but not deciding, that the time and cost recorded by plaintiffs' counsel is accurate, we hold. for the reasons that follow, that plaintiffs' counsel has been more than amply compensated from the funds they have received to date.

Pursuant to the terms of the Agreement, BellSouth retained a third party administrator, Garden City Group, Inc. ("GCG"), to assist in processing settlement claim forms. We find that GCG's implementation of the claims process was in accordance with the Agreement. As set forth in the following "Valuation Table," GCG mailed 4,224,552 claim forms to class members beginning on 15 March 1996. GCG received 180,314 claims before the 13 June 1996 deadline. a response rate of 4.3 percent. The maximum

value of the credit requests actually submitted by class members was $1,718,594.40.

## Valuation Table of Inside Wire Maintenance

### Service Plan Litigation Settlement

| | Alabama | Louisiana | Mississippi | Tennessee | Total |
|---|---|---|---|---|---|
| Forms Mailed | 1,034,310 | 1,154,480 | 655,336 | 1,380,426 | 4,224,552 |
| Total Claims Received | 45,974 | 52,097 | 28,273 | 53,912 | 180,314 [2] |
| Response Rate [3] | 4.4% | 4.5% | 4.3% | 3.9% | 4.3% |
| Max. Credit | $ 14.40 | $ 19.20 | $ 19.20 | $ 12.00 | ---- |
| Total Value of Potential Credits [4] | $14,894,064 | $22,166,016 | $12,582,451.20 | $16,565,112 | $66,207,643.20 |
| Actual Credits [5] | 28,253 | 31,407 | 17,054 | 31,775 | 108,489 |
| Max. Value of Actual Credits [6] | $ 406,843.20 | $ 603,014.40 | $ 327,436.80 | $ 381,300 | $ 1,718,594.40 |
| Total Cancels [7] | 37,561 | 41,156 | 22,518 | 42,982 | 144,217 |

Plaintiffs' counsel suggests that the class benefited in ways that are not reflected in the Valuation Table. We consider each contention in turn.

First, plaintiffs' counsel contends that the class and the public have been educated as to the choices in inside wire maintenance service plans that exist. We find that class members did benefit from increased information about the market. Almost all the value of this information, however, is already accounted for in the credits and cancellations requested by class members. The additional intangible economic value of market education is reflected in the paltry response rate of the class. When educated of their options, most class members decided not to make a change. The collective response of the class demonstrates that the intrinsic value of the education provided by this litigation was picayune.

Second, plaintiffs' counsel avers that the price for inside wire maintenance service has remained static since the time the lawsuit was filed. Counsel assumes that the reason for this purported price freeze is this class action litigation. Even if this were true, there is no evidence submitted that the value provided by a BellSouth inside wire maintenance service plan has increased in the same time period. If neither the price nor the value has increased, there is no net utility provided to the consumer. We therefore are not convinced that a price freeze on inside wire plans is a benefit arising from this litigation.

Third, counsel asserts that the percentage of BellSouth customers paying for inside wire plans has dropped considerably from the time the lawsuit was filed. Again, even if we assume that this reduction is attributable to this litigation, we are not convinced that this is a benefit to the consumers. Are competitive plans providing the same service at a lower price? Are consumers without the plan being forced to pay higher costs in internal maintenance? As we discussed above, the tepid reactions of the class suggest that the gains to the free market from this settlement are not as great as plaintiffs' counsel opines.

In sum, we find that there are intangible gains to the class not reflected in the economic valuation table. The class has benefited through increased information about the market for internal wire plans. The value of this information, however, is almost entirely accounted for in the Valuation Table by customers who requested credits and/or cancel-

2. Includes 58 responses from non-class members.

3. Total Claims Received divided by Forms Mailed.

4. Forms Mailed multiplied by Maximum Credit. This figure represents potential value if all class members were eligible for credit and returned a claim.

5. Total of "Credit & Cancel" and "Credit Only" claims returned.

6. Actual Credits multiplied by Maximum Credit.

7. Total of "Credit & Cancel," "Cancel Only," and "Phase II Cancel" claims returned.

lation. We conclude that the value of the intangible benefit is insubstantial.

### III. Conclusions of Law

 Upon settlement of a class action lawsuit, the district court has a responsibility to assess the reasonableness of the requested attorneys' fees before approving the settlement under Rule 23(e). *Parker v. Anderson*, 667 F.2d 1204, 1213 (5th Cir.1982). The court has great discretion in fulfilling this important responsibility:

> A district court's exercise of this broad discretion to review and modify a fee agreement is not limited to situations in which it finds windfall, adverse class impact, or other irregularity. Whenever a court finds good reason to do so, it may reject an agreement as to attorneys' fees just as it may reject an agreement as to the substantive claim.

*Hayes v. Haushalter (In re FPI/Agretech Securities Litigation)*, 105 F.3d 469 (9th Cir. 1997) (quoting *Smiley v. Sincoff*, 958 F.2d 498, 501 (2nd Cir.1992)).

 The reason that the court is obliged to scrutinize fee agreements between defendants and plaintiffs' counsel in class action settlements is that there is an inherent conflict between the interests of the class and class counsel.[8] The effect of this often unchecked conflict is inflated legal fees and a perception in society that lawyers are abusing the system. *See* Lawrence W. Schonbrun, *Class Actions: The New Ethical Frontier*, 30 Manhattan Inst. Civil Justice Memo I (1996).

Legal scholars have expressed growing concern about the conflicts between a class and its counsel. "[T]hese attorneys are not subject to monitoring by their putative clients, they operate largely according to their own self-interest, subject only to whatever constraints might be imposed by bar discipline, judicial oversight, and their own sense of ethics and fiduciary responsibilities." Jonathan R. Macey & Geoffrey P. Miller, *The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation*, 58 U. Chi. L.Rev. 1, 7–8 n. 4 (1991). Judge Posner has noted that

> the absence of a real client impairs the incentive of the lawyer for the class to press the suit to a successful conclusion. His earnings from the suit are determined by the legal fee he receives rather than the size of the judgment. No one has an economic stake in the size of the judgment except the defendant, who has an interest in minimizing it. The lawyer for the class will be tempted to offer to settle with the defendant for a small judgment and a large legal fee, and such an offer will be attractive to the defendant, provided the sum of the two figures is less than the defendant's net expected loss from going to trial. Although the judge must approve the settlement, the lawyers largely control his access to the information—about the merits of the claim, the amount of work done by the lawyers for the class, the likely damages if the case goes trial. etc.—that is vital to determining the reasonableness of the settlement.

Richard A. Posner, *An Economic Analysis of Law* 570 (4th ed.1992). Because neither defendants nor class members are useful monitors of class counsel fee agreements, oversight is left to the courts.

 In *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), the Fifth Circuit enunciated standards for determining the reasonableness of attorneys' fees in class actions. The *Johnson* factors are: (1) the time and labor involved; (2) the novelty and difficulty of the questions: (3) the skill required to perform the legal service properly; (4) the preclusion of other employment; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the political

---

**8.** This conflict is not limited to situations in which attorneys' fees are drawn from a "common fund" with the award to plaintiffs. *See In re General Motors Corp. Pick–Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768, 820

(3rd Cir.1995). Even where, as here, the attorneys' fees are negotiated separately and at "arm's length," they still reduce the size of the total pie available to the class.

"undesirability" of the case; (11) the nature and length of the professional relationship with the client: and (12) awards in similar cases. 488 F.2d at 717–19. *Piambino v. Bailey*, 610 F.2d 1306 (5th Cir.1980), added two additional factors: the difficulty of the case and the uncertainty of the recovery.

The Fifth Circuit has never set forth a mathematical equation for weighing the *Johnson* factors. Although we consider all the factors, several guiding principles are clear. First, a review of the time and labor required is a "necessary ingredient" to an evaluation of the requested attorneys' fee. *Johnson*, 488 F.2d at 717. Second, the court should consider the requested fee in light of the benefits conferred upon the class. *Hayes*, 105 F.3d at 473.

In this case, I could hold my nose and accept the settlement, after all, it is said that a bad settlement is better than a good trial. When it comes to approval of attorney fees under the circumstances presented in this case, the court is the gatekeeper. We will not allow to pass that which reeks with impropriety and overreaching.

Class and local Louisiana counsel claim to have cumulatively labored 21,201.70 hours on this case. The total attorneys' fees requested are $5,347,453.02, or approximately $252 per hour. We conclude that any amount in excess of $3,847,453.02 (approximately $181 per hour) would be excessive, given the results achieved in the litigation. In other words, under a lodestar approach, we do not feel a multiplier is appropriate. If anything, the fees should be reduced in light of the insignificant benefit to the class members.

While a lodestar equation is a useful starting point, a valuation of the results achieved in a class action settlement is essential to a final determination of attorneys' fees. Counsel would ask this court to believe that the benefits to the class in this case exceeded $64 million. Our sibling courts relied on this figure to affirm the requested fees. They concluded that fees and costs of approximately ten percent of the value of the settlement were not unreasonable.

Now that the settlement claim forms have been returned by the class members, it is clear that the $64 million figure is a phantom. Neither the true economic value of an offered credit to its recipient, nor the true economic cost to its issuer, is equivalent to its face value. *See* Schonbrun, 30 Manhattan Inst. Civil Justice Memo at 2. If it were, a newspaper containing $10 worth of coupons would be as valuable as a $10 bill. Many customers never cash in coupons. Those who do cash a coupon often receive the benefit months or years later, so the true value of the coupon is slightly less.

In this case, $66 million represented the potential maximum value of the settlement if all class members were eligible for a credit and returned a claim. In fact, the value of the actual credit requests submitted was $1,718,594.40. As we have noted that there may be intangible benefits to the class. we will adjust this valuation figure up to $2 million.

A request for $6 million in attorneys' fees where counsel has provided no more than $2 million in benefits to the class is astonishing. It is a sad day when lawyers transmogrify from counselors into grifters. Suffice it to say that we find the request unreasonable.

After considering all the *Johnson* factors, with a focus on the hours worked and the results achieved, we conclude that any award of attorneys' fees and costs to plaintiffs' counsel in excess of $4.5 million would be unjust. As our province is only to determine if an additional $1.5 million should be awarded, further analysis is not required. We conclude that plaintiffs' counsel are not entitled to any additional compensation from BellSouth.

## IV. *Conclusion*

We previously approved the substantive settlement of this case, but left open the question of attorneys' fees and costs. Plaintiffs' counsel and defendant jointly suggest that $1.5 million in attorneys' fees and costs should be added to the $4.5 million previously paid by defendant to plaintiffs' counsel. After reviewing the response of class members to the settlement and calculating the value of the settlement to the class, we find that the

requested fees and costs are grossly disproportionate to the benefits to the class. We accordingly conclude that no additional fees and costs are merited.

This class action settlement is unusual in at least two aspects. First, the settlement has been approved separately by four federal courts. Second, we have segregated the attorneys' fees issue from the substantive settlement. Because the other three courts previously approved the settlement in whole and we approved the substantive settlement, our resolution of the attorneys' fees issue today concludes the settlement of this case.

We approve the settlement pursuant to Rule 23(e) and DISMISS this case, while retaining jurisdiction over the Agreement to enforce its provisions.