Dunn v. Dart, 2011 NCBC 23.

| | | |
|---|---|---|
| STATE OF NORTH CAROLINA | ) | IN THE GENERAL COURT OF JUSTICE |
| | ) | SUPERIOR COURT DIVISION |
| COUNTY OF CRAVEN | ) | 09 CVS 02600 |
| | ) | |
| DONALD J. DUNN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | ORDER AND OPINION |
| HENRY T. DART AND ROBERT E. | ) | |
| ZAYTOUN, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

{1} THIS MATTER is before the Court on the motion pursuant to North Carolina Rule of Civil Procedure 56 styled Defendants' Motion for Summary Judgment and Defendant Dart's Alternative Motion for Summary Judgment.

*Harris, Creech, Ward, and Blackerby, P.A. by W. Gregory Merritt and Thomas E. Harris for Plaintiff Donald J. Dunn.*

*McCotter, Ashton, & Smith, P.A. by Charles K. McCotter, Jr. and Creech Law Firm, P.A. by Paul P. Creech for the Defendants Henry T. Dart and Robert E. Zaytoun.*

Gale, Judge

## I. INTRODUCTION

{2} Plaintiff Donald J. Dunn ("Dunn") and Defendants Henry T. Dart ("Dart") and Robert E. Zaytoun ("Zaytoun") were three members of a seven member Plaintiffs' Management Committee ("PMC") appointed by the court in a federal class action lawsuit, Beaulieu v. E.Q. Indus. Servs., Inc., No. 5:06-CV-400 BR, Eastern District of North Carolina, Western Division ("*Beaulieu*") arising out of an October 5, 2006 explosion at the EQ Industrial Services ("EQ") plant in Apex, North Carolina. The present dispute involves how the parties are to share in attorneys'

fees awarded to the PMC totaling $2,983,000 as a part of the class action settlement. The PMC Fee Subcommittee recommended an allocation among the seven members. The individual members opposed that allocation and filed a motion to compel arbitration in the Eastern District class action which was assigned to United States Magistrate Judge James E. Gates. By a December 23, 2009 order, Magistrate Judge Gates approved the PMC Fee Subcommittee recommendation upon the PMC's representation that all disputes underlying the motion to compel had been resolved by agreement. That allocation provided for payments to Dart of $995,000, Zaytoun of $670,000 and Dunn of $75,000, totaling $1,740,000. Dunn claims he is entitled to a greater share through his prior separate agreement with Dart and Zaytoun, and that such agreement remains enforceable after Judge Gates' order. Dart and Zaytoun deny that any such agreement existed in the first instance, that any such agreement would be unenforceable if reached as it was never approved by clients, and that Magistrate Judge Gates' was a final adjudication barring the present Complaint.

{3} The Court concludes that while fee-splitting percentages on which an agreement would be negotiated were apparently agreed to, no final agreement was reached, and that any such agreement solely among counsel was unenforceable until client approval. The Court further concludes that it is unnecessary separately to reach the issues raised by Defendants' equitable and claim preclusion defenses. Accordingly, the Court GRANTS Summary Judgment for Defendants.

## II. PROCEDURAL BACKGROUND

{4} Dunn filed his Complaint in this action in Craven County Superior Court on December 23, 2009. Dart and Zaytoun removed the case to the United States District Court for the Eastern District of North Carolina on December 31, 2009. The Honorable Louise W. Flanagan, Chief United States District Court Judge, entered an order remanding the case to state court for lack of federal subject matter jurisdiction on April 20, 2010. The case was then designated as a complex business case on May 21, 2010 and assigned to this court. On January 13, 2011, following

the completion of discovery, Dart and Zaytoun filed Defendants' Motion for Summary Judgment and Defendant Dart's Alternative Motion for Summary Judgment. The various grounds for the joint motion include their contention that: 1) there is insufficient evidence to prove that any enforceable fee-sharing agreement was ever entered; 2) if any such agreement was reached, it was not approved by the clients as required by North Carolina Rule of Professional Conduct 1.5; 3) a novation occurred when any initial agreement was substituted by the subsequent agreements on which the allocation approved by Magistrate Judge Gates was based; and 4) Dunn's present action is inconsistent with and barred by Magistrate Judge Gates' order to which Dunn consented. Dart's individual motion is based on the proposition that Dunn's claim would entitle him to a greater award than he received under the allocation Magistrate Judge Gates approved.

### III. STATEMENT OF FACTS

{5} The material facts necessary to resolve the pending motion are undisputed. The dispute is rather the legal import of those facts.[1]

{6} Dart is a Louisiana attorney with substantial class action experience. Prior to the October 5, 2006 explosion at the EQ facility in Apex, North Carolina on which the class action underlying this dispute had occurred, Dunn and Dart had worked together on a class action representing residents of Kinston, North Carolina who were adversely affected by the 2003 explosion at the West Pharmaceutical plant. They did so pursuant to a fee-sharing agreement by which Dart advanced all costs and they divided the fees two-thirds to Dart and one-third to Dunn.

{7} Very shortly after the EQ explosion, Dunn and Dart discussed potentially filing a class action with claims similar to those in the Kinston class action and pursuant to the same fee-sharing agreement. At this time, however, neither Dart nor Dunn had clients affected by the EQ explosion who could serve as class

---

[1] The Court does not adjudicate facts in ruling on a motion for summary judgment, and typically an order ruling on such a motion does not include a detailed recitation of facts. However, such a recitation is appropriate to elucidate the basis for the Court's ruling. *See Capps v. City of Raleigh*, 35 N.C. App. 290, 292, 241 S.E.2d 527, 529 (1978).

representatives. Dunn contacted Zaytoun to explore Zaytoun's interest in associating with Dart and Dunn on the basis that Dart would advance all costs and would receive two-thirds of any fee, with Dunn and Zaytoun sharing equally in the remaining one-third fee. Zaytoun represented two families who had claims arising from the EQ explosion – the Carleys and the Wilders.

{8} Dart, Zaytoun, and Dunn filed a class action in the Eastern District of North Carolina on October 10, 2006 naming the Carleys and the Wilders as class representatives. ("*Carley*" or the "*Carley* Action"). A fourth attorney Allen Usry also appeared as counsel of record.[2] Dunn contends that he, Dart, and Zaytoun had orally agreed to the above fee-sharing arrangement prior to the filing of the action but had not yet reduced the agreement to writing. Dart and Zaytoun acknowledge preliminary negotiations but contend that no final agreement was ever consummated. Both parties rely on two e-mails to support their position.

{9} Dunn contends that these two e-mails are a written confirmation of the oral agreement the three had reached.[3] On October 22, 2006, Zaytoun sent an e-mail to Dart, copied to Dunn, stating:

> In view of the arrangement we have contemplated on fee split and cost-bearing as forecast by Donnie to me early last week, Stacy and I would like to be sure that we are moving forward on the basis that costs will be borne by Hank's firm (to what extent?, what expenses?); and the fee split will be 66 2/3 to Hank and we will split with Donnie 50-50 the remaining one-third. Is this correct? If so, I suggest that we put this in the form of a letter memorandum of understanding. We also need to get fee agreements signed with our current clients this week.[4]

On October 23, 2066, Dart sent the following response, copied to Dunn:

> I agree with your understanding of the fee split and cost responsibility. I will be happy to memorialize that in a letter agreement and circulate it among us tomorrow.[5]

---

[2] Defs.' Ex. 1. Plaintiff and Defendant each filed a substantial appendix in support of their memoranda on the motion. The Court will cite to those as "Pl.'s Ex. [ __ ]" and "Defs.' Ex. [ __ ]."

[3] Defs.' Ex. 22 at 18-19.

[4] Pl.'s Ex. 1.

[5] Pl.'s Ex. 2.

The parties never executed any other writing reflecting agreement to this fee proposal. There is no evidence that these e-mails were shared with the Carleys or the Wilders.

{10} As of October 31, 2006, there was also apparently no final understanding of all attorneys that might share in fees, and specifically whether Allen Usry, who had appeared on the *Carley* complaint, would be a party to the fee-sharing agreement. Dunn wrote Dart and Zaytoun that day, advising that: "according to our ethical requirements, we need to know if Allen is going to participate. Our ethical rules require that the attorney fee contract identify all lawyers and their percentage of fee in a fee sharing arrangement." [6] Dunn indicated in that e-mail that he had drafted a fee agreement reflecting only Dart, Zaytoun and Dunn as participating counsel. [7]

{11} Three class actions in addition to *Carley* were also filed in or removed to the Eastern District. On June 20, 2007, the Eastern District court issued a Case Management Order consolidating all actions into the *Beaulieu* action, appointing the PMC, and appointing Zaytoun as Liaison Counsel.

{12} All class representatives, including the Carleys and the Wilders, executed Supplemental Retainer Agreements with the PMC in November 2007. [8] These acknowledge that the class representatives are being represented by "one or more of the above-mentioned attorneys . . . pursuant to a written attorney employment contract," and that the Supplemental Retainer Agreement does not alter or amend the contract except as set forth in paragraph 3, which states:

> I hereby retain the above-mentioned PMC and associated
> attorneys to represent me in all matters pertaining to
> class certification and all common class issues after
> certification . . . understand and agree that if a class-wide
> settlement or judgment is obtained for a certified class in

---

[6] Defs.' Ex. 33.

[7] *Id.* At oral argument, the parties indicated that this draft was not produced during discovery. Dunn indicated that he drafted the agreement, which appears to be disputed. However, all agree that such agreement, if drafted, was not signed.

[8] Defs.' Ex. 4.

> which I am a member, the Court may establish and
> allocate a reasonable attorneys' fee among my individual
> attorney, the PMC and associated attorneys, which may
> alter the contingent fee set forth in my current attorney's
> employment contract.[9]

These Supplemental Retainer Agreements are the only fee agreements ever signed by the Carleys or the Wilders.

{13} Settlement discussions were underway in the class action in early 2008. At the time, the PMC members had not yet executed a PMC agreement, although Dart and Zaytoun advocated such a written agreement.[10] As negotiations between PMC members continued, Dart sent Dunn an e-mail on Sunday March 9, 2008 concerning a separate agreement between the three, stating:

> Donny, Robert is getting nervous about not having an
> agreement among the 3 of us in writing, given that he's
> spent about $40k on the case so far. Would you be able to
> come up to Raleigh Tuesday before the mediation so the 3
> of us can meet after the Deshong deposition and hammer
> out an agreement among the 3 of us?[11]

Dunn testified that he responded affirmatively to this e-mail, but the proposed meeting never took place.[12]

{14} Each PMC member executed a written agreement on May 30, 2008 ("PMC Agreement").[13] The PMC Agreement has multiple provisions which provide for, *inter alia*, equalizing cost responsibility among PMC members,[14] allocating

---

[9] *Id.*

[10] Defs.' Ex. 34; Defs.' Ex. 36.

[11] Defs.' Ex. 31.

[12] Defs.' Ex. 22 at 40.

[13] Defs.' Ex. 5.

[14] Defs.' Ex. 5 ¶¶ 3-10. At the time of the agreement, Dart had advanced $58,223.17, Zaytoun had advanced $36,572.18, and Dunn had not made any advancement. Defs.' Ex. 5 at Ex. A. The PMC Agreement provided for a true up among the seven members for past advances and for assessments going forward. Although the provision was later not followed, the PMC Agreement provided that 35% of any class fees would be allocated according to costs advanced and 65% would be allocated based on work performed. Defs.' Ex. 5 ¶ 24. Dart agreed to assume Dunn's cost responsibility. Defs.' Ex. 22 at 54. Later, when it appeared that a class settlement would be approved, Dunn asked Dart to allow him to "buy back" his financing share, which Dart refused. Defs.' Ex. 26 ¶ 26. Dart never paid any portion of Zaytoun's expenses. Defs.' Ex. 26 ¶ 27.

attorney fees between the PMC and individual attorney contracts,[15] and appointing a PMC Fee Subcommittee to recommend allocation of any court awarded fees. The PMC Agreement was based on and is to be enforced pursuant to North Carolina law.[16]

{15} Senior United States District Court Judge W. Earl Britt approved a class settlement for $7,850,000 in July 2009. On October 9, 2009, Judge Britt approved attorney fees in the amount of $2,983,000.00, payable to class counsel, and reimbursement for costs in the amount of $322,241.50, retaining jurisdiction to resolve any payment dispute.[17]

{16} The PMC Fee Subcommittee undertook its effort to recommend the allocation of the court's fee award. Dunn requested that the Subcommittee allocate him $350,000.00.[18] The Fee Subcommittee submitted a narrative report containing the following fee recommendation on November 10, 2009:[19]

| PMC MEMBER | FEE ALLOCATION | COST ALLOCATION |
|---|---|---|
| Henry T. Dart | $995,000.00 | $87,875.00 |
| Donald J. Dunn | $75,000.00 | $3,911.82 |
| M. David Karnas | $740,000.00 | $69,037.38 |
| J. Michael Malone | $390,000.00 | $36,381.51 |
| Roger W. Orlando | $75,000.00 | $66,013.77 |
| Jesse S. Shapiro | $35,000.00 | -0- |
| Robert E. Zaytoun | $670,000.00 | $59,022.02 |

{17} The PMC Agreement provided that the Fee Subcommittee recommendation was binding only upon unanimous consent of all PMC members and provided that any PMC member agreed to submit an allocation dispute to binding arbitration.[20] On November 20, 2009, each of the PMC members demanded

[15]Defs.' Ex. 5. Paragraph 20 of the PMC Agreement provided that 50% of any fee obtained by a PMC member because of individual contracts with class members would be dedicated to the common fund to be shared by all PMC members.
[16] Defs.' Ex. 5 ¶ 35.
[17] Defs.' Ex. 11. Dunn filed an affidavit claiming incurred costs of $3,911.82, which the PMC Fee Subcommittee accepted. There does not appear to be any dispute over cost reimbursements.
[18] Defs.' Ex. 13.
[19] Defs.' Ex. 12.
[20] Defs.' Ex. 5 ¶ 28.

arbitration of their allocations. Dart requested an allocation of $1,675,000, and Zaytoun requested an allocation of $1,350,000.[21] The PMC members filed a Motion to Compel Arbitration in the Eastern District on November 30, 2009.[22]  On December 2, 2009, Magistrate Judge Gates held a telephone conference with PMC members,[23] followed by his December 4, 2009 order[24] asking for briefing by December 18, 2009 on whether the court had authority to order arbitration and whether, in lieu of arbitration, the dispute should be referred to a special master. Magistrate Judge Gates also encouraged the parties to continue efforts to resolve their disputes.

{18} The PMC Members then undertook further negotiations.  On December 14, 2009, the PMC advised Magistrate Judge Gates that the parties had agreed to have a special master appointed rather than proceeding with arbitration.  They did so by filing a stipulation which provided for a special master proceeding "exclusive of contract claims among fewer than all members of the PMC and arising independent of the PMC Agreement."[25]    Dunn sent an e-mail on December 15, 2009 to Dart and Zaytoun asserting his position that he was entitled to enforce the initial agreement he contends provides for a split of two-thirds of the fee to Dart,

---

[21] Defs.' Ex. 21; Defs.' Ex. 37.

[22] Defs.' Ex. 14.

[23] Defs.' Ex. 15.   Prior to the December 2 hearing, Mike Malone, on behalf of the PMC, had requested that the undersigned, who was then in private practice, serve as an arbitrator if there were no conflict of interest.  He provided the names of the PMC members but no further information about the details of any dispute and did not provide details regarding the allocation that was before Judge Gates.  Later, the undersigned was  advised that the matter would be subject to a special master proceeding rather than arbitration and that the undersigned would be appointed by Magistrate Judge Gates as a special master.   The undersigned was provided no further background information and undertook no substantive efforts before being advised that his services would not be needed.   The undersigned never submitted any statement for services or expenses.   The undersigned was later appointed as a judge to serve on the Business Court and the case was assigned to the undersigned. The parties were advised of this background and these circumstances and given an opportunity to have the case reassigned to another Business Court judge with the need for any further motion or grounds stated.  Each of the parties advised the court in writing and on the record at the hearing on the motion for summary judgment that they wished the undersigned to continue as the judge assigned to the case.

[24] Defs.' Ex. 16.

[25] Pl.'s Ex. 3.

with Zaytoun and Dunn sharing the remaining one-third.[26]  Dunn stated his expectation of a $350,000.00 fee, and that he "did not care from whom it comes."[27]

{19} PMC Members exchanged a series of e-mails on December 17 and 18, 2009 in an effort to resolve disputes before the December 18, 2009 briefing deadline set by Magistrate Judge Gates.  These e-mails, in part, speak to whether individual fee contract disputes had been withdrawn from the proceeding before Magistrate Judge Gates, such that the matter before Magistrate Judge Gates was limited to whether to approve the PMC Fee Subcommittee recommendation.   At 5:26 p.m. on December 17, 2009, Dart indicated that he would dismiss his claim if other PMC members did likewise.[28]   Dunn replied at 5:47 p.m., saying that he, too, would withdraw his objection if all other PMC members did. [29] Zaytoun replied at 6:05 p.m., indicating that he would not withdraw his objection "until I receive email confirmation from Donnie Dunn that he has **unconditionally** withdrawn his objection."[30]  Dart sent an e-mail at 11:21 p.m. with a proposed consent motion and order, and stating Dart's belief that individual rights to bring a separate lawsuit over alleged contractual agreements among PMC members were preserved.[31]  On the morning of December 18, 2009, Dart wrote Roger Orlando, another PMC member, indicating that, "[w]e specifically excluded side deals and private contract claims from this process."[32]  Orlando and some other PMC members had a side agreement which they resolved by an agreement that would provide that they receive fees which collectively totaled the amount awarded to them in the PMC Fee Subcommittee allocation but which would be paid in individual amounts which varied from that allocation.[33]

---

[26] Defs.' Ex. 43.
[27] *Id.*
[28] Pl.'s Ex. 5.
[29] *Id.*
[30] *Id.* (emphasis in original)
[31] *Id.*
[32] Pl.'s Ex. 4.
[33] *Id.*

{20} On December 18, 2009, Dunn sent an e-mail at 9:22 a.m. indicating that he had not yet studied Dart's proposed motion, but stating that he would not agree to the disbursed fee allocation with Dart and Zaytoun until he "was fairly paid."[34] Dart responded at 10:29, "Then there is no deal. Prepare for battle."[35] At 11:43 a.m., Dunn replied indicating that he was "considering withdrawing my objection to disbursing, however, I will not have an answer until 3:30 today." [36] At 3:24 pm, Dunn sent an e-mail stating, "I hereby withdraw my objection to disbursement of funds by the Court [and the settlement administrator] . . . Also, my withdrawal of my objection to disbursement is done based on my specific reservation of any and all claims I may have against Hank and Robert based on contractual agreements."[37]

{21} The PMC filed its Unopposed Motion to Dismiss the Motion to Compel Arbitration, To Approve Attorney's Fee Allocation and for Distribution of Attorney's Fees at 4:11 p.m. on December 18, 2009, which was signed by each PMC member. ("Unopposed Motion")[38]  In its accompanying memorandum, the PMC stated that: "On 18 December 2009, all members of the PMC agreed to dismiss all objections to the allocation of attorneys fees, to accept the allocation of attorneys' recommended by the PMC Fee Sub-Committee (Exhibit A), and to request the immediate payment of those fees by the Settlement Administrator." [39]  The motion did not mention any side agreements or any dispute about such agreements.

{22} Magistrate Judge Gates granted the Unopposed Motion on December 23, 2009, reciting that the "memorandum supporting the motion states that the Class Counsel attorneys have resolved the previous disagreement among them regarding allocation of the awarded fees, which had prompted the motion to compel arbitration, and that all Class Counsel attorneys agree to the allocation set out in Exhibit A . . . There is no opposition of record to the proposed allocation."[40]

---

[34] Defs.' Ex. 39.
[35] Defs.' Ex. 40.
[36] Defs.' Ex. 41.
[37] Pl.'s Ex. 6.
[38] Defs.' Ex. 17.
[39] Defs.' Ex. 18.
[40] Defs.' Ex. 19.

Magistrate Judge Gates cited *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 869-70 (E.D. La. 2007) for the proposition that final apportionment of court awarded fees can be left to class counsel who are able to come to an agreement.[41]

{23} Dunn filed this action in state court a few hours after the entry of Magistrate Judge Gate's Order. Dunn maintains that he agreed to the allocation because of his concern that further court proceedings might result in a reduction in the total amount awarded to Dart, Zaytoun, and Dunn collectively, and that he believed that he had reserved his right to bring suit to ask for a percentage of the collective award because disputes over side agreements had been removed from the matter before Magistrate Judge Gates.[42]

{24} Dart and Zaytoun removed the matter to the Eastern District and sought to have it consolidated with *Beaulieu.* Dunn moved to remand. After briefing, Chief United States District Judge Flanagan remanded the matter to state court.[43] Dart and Zaytoun advised Judge Flanagan of the side agreement which Dunn asserts in this action, and argued that the issue should be resolved by the federal court, and specifically the *Beaulieu* court , because the dispute directly related to that court's jurisdiction over the common fund created by the class action settlement. In rejecting federal court jurisdiction, Judge Flanagan found that Dunn's claim "does not challenge the federal district court's division of any fee," and "[t]he determination of whether a separate fee-sharing agreement exists does not raise any such substantial federal question."[44]

## IV. STANDARD OF REVIEW

{25} The purpose of summary judgment is to dispense with formal trials in cases where only legal issues remain "by permitting penetration of an unfounded claim or defense in advance of trial and allowing summary disposition for either party when a fatal weakness in the claim or defense is exposed." *Elliott v. Duke*

---

[41] *Id.*

[42] Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. at 4.

[43] Pl.'s Ex. 7.

[44] *Id.* at 3-4.

*University, Inc.*, 66 N.C. App. 590, 592, 311 S.E.2d 632, 634 (1984). This Court must decide, on the basis of the pleadings, depositions, and other evidentiary materials presented, whether there is any genuine issue of material fact and whether the claim in question may be resolved as a matter of law. *Stephenson v. Warren*, 136 N.C. App. 768, 770-71, 525 S.E.2d 809, 811 (2000). The burden is on the moving party to show that no genuine issues of fact exist, and it may be met "by proving that an essential element of the opposing party's claim is nonexistent, or by showing through discovery that the opposing party cannot produce enough evidence to support an essential element of his claim." *Elliott*, 66 N.C. App. at 592, 311 S.E.2d at 634. Once this burden has been satisfied, "the burden shifts to the non-moving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, establishing at least a prima facie case at trial." *Stephenson*, 136 N.C. App. at 772, 525 S.E.2d at 812. If the non-moving party fails to meet its burden, the moving party is entitled to judgment as a matter of law. *Id.*

## V. ANALYSIS

A. <u>The Existence of a Fee-Sharing Agreement in the First Instance</u>

{26} Dunn alleges that the parties reached agreement on the essential terms of a percentage division of fees and expenses, confirmed by written e-mails, and that any additional term may be implied by the obligations attendant to the attorney-client relationship. Dart and Zaytoun urge that there is no evidence that there was never final agreement to material terms, and that undisputed evidence demonstrates that the parties expected a writing before reaching final agreement.

{27} To form a contract, there must be "an assent to the same thing in the same sense and [the parties'] minds must meet as to all the terms." *Miller v. Rose*, 138 N.C. App. 582, 587-88, 532 S.E.2d 228, 232 (2000). Mutual assent is not determined by what the "the party intended… but," rather "what a reasonable person" in the like position of the parties would have interpreted the offer and acceptance to represent. *Howell v. Smith*, 258 N.C. 150, 153, 128 S.E.2d 144, 146 (1962). Therefore, when determining if mutual assent is present, the Court

considers the "expressed intention of the parties," or more specifically, "their words and acts." *Id.* Where the "evidentiary forecast" offered by the plaintiff indicates that the parties failed to meet minds as to the essential terms of the agreement, summary judgment in favor of the defendants is proper." *Miller*, 138 N.C. App. at 588, 532 S.E.2d at 232. Moreover, "[t]he terms of a contract must be sufficiently definite and certain." *Id.* Thus, when a contract "'leaves material portions open for future agreement," it fails for "indefiniteness" as a matter of law. *Id.* (quoting *MCB Limited v. McGowan*, 86 N.C. App. 607, 609, 359 S.E.2d 50, 51 (1987)).

{28} The October 2006 e-mail exchanges, read objectively, reflect an initial understanding as to fee and cost sharing provisions upon which the contemplated agreement would be negotiated; however, they also indicate the expectation of further negotiation and approval of a written agreement. Dunn's October 31, 2006 e-mail reflects that there was yet no final agreement on which attorneys would participate in the fee-sharing. The negotiations were for a single action in which these attorneys would be sole counsel, in contrast to the consolidated class action to which Dunn seeks to apply the agreement. Even the March 9, 2008 e-mail several months later reflects that there were still terms to be fleshed out and reduced to writing. The Court concludes that the evidence does not indicate an assent by the parties to necessary material terms, but rather a contemplation of a future final agreement which was never reached.[45]

{29} The Court further notes that subsequent conduct casts doubt on whether the parties believed that they had the agreement Dunn asserts. Clearly, Dart did not advance all costs. Dunn's request to repurchase financing shares so that he might participate in that portion of fees as provided by the PMC Agreement suggests that he believed that the PMC Agreement would control all fees. Dunn made no effort to insist on a separate retainer agreement with the Carleys and the Wilders at the time of the Supplemental Retainer Agreements. The Court believes

---

[45] If there were final agreement between the attorneys on all essential terms, the question would remain whether the agreement would be enforceable until reduced to writing and agreed to by the clients themselves. That issue is discussed below.

this pattern of conduct amplifies the lack of mutual assent to the fee-sharing agreement Dunn promotes.

{30} In sum, Dunn has not forecast sufficient evidence of an agreement to justify trial. Summary judgment is, therefore, appropriate on the ground that no binding agreement was ever reached.

B. Application of North Carolina Rule of Professional Conduct 1.5

{31} While summary judgment might rest alone on the basis that there was no agreement, the Court also concludes that any agreement that may have been reached is not enforceable pursuant to North Carolina Rule of Professional Conduct 1.5. That Rule provides that "a division of a fee between lawyers who are not in the same firm may be made only if . . . the client agrees to the arrangement, including the share each lawyer will receive, and the agreement is confirmed in writing." Rule 1.5(e)(2) N.C.R.P.C. Rather than speaking solely to enforcement, the Rule provides that no contract is "made" absent the client agreement. While Dunn offers what he contends is written confirmation of an agreement among the three attorneys, he has offered no evidence of the approval of that agreement by the clients.

{32} Further, a separate provision of the Rule requires that "a contingent fee agreement shall be in a writing, signed by the client, and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue." Rule 1.5(c) N.C.R.P.C. Dunn was well aware of these constraints as evidenced by his own e-mail.[46] Yet, clearly, there is here no written agreement signed by the Carleys and/or Wilders assenting to the fee sharing agreement Dunn now asserts. There is no such issue with the PMC Fee Subcommittee allocation approved by the Eastern District. The Carleys and Wilders acknowledged and agreed to that potential fee process when signing the Supplemental Retainer Agreements.

{33} Dunn raises the question that the agreement he asserts is invalidated by Rule 1.5 because the North Carolina courts have held that a "breach of a provision

---

[46] Defs.' Ex. 33.

of the Code of Professional Responsibility is not in and of itself . . . a basis for liability." Rules of Professional Conduct, Rule 0.2[7]; *Baars v. Campbell Univ., Inc.*, 148 N.C. App. 408, 421, 558 S.E.2d 871, 879 (2002); *Webster v. Powell*, 98 N.C. App. 432, 439, 391 S.E.2d 204, 208 (1990), *aff'd*, 328 N.C. 88, 399 S.E.2d 113 (1991) (quoting *McGee v. Eubanks*, 77 N.C. App. 369, 374, 335 S.E.2d 178, 181 (1985), *disc. review denied*, 315 N.C. 589, 341 S.E.2d 27 (1986)). As Judge Ervin of the North Carolina Appeals explained in his well-reasoned opinion, this limitation on use of the Rules of Conduct does not mean, however, that they "have utterly no bearing on the proper resolution of civil litigation." *Cunningham v. Selman*, 689 S.E.2d 517, 529, 2009 N.C. App. LEXIS 2253 at *35-36 (N.C. App. 2009).[47]

{34} Like the North Carolina Rule, the ethical rules in most jurisdictions require that a client "agree" or "consent" to any fee division arrangement between attorneys of different firms, including the share each lawyer will receive, and the agreement to be confirmed in writing. ABA Model R. Prof. Conduct 1.5(e). Other jurisdictions have held that a violation of the rule renders the agreement unenforceable as matter of public policy. *See In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 216, 7 Fed. R. Serv. 3d 1063 (2d Cir. 1987); *Marcus v. Garland, Samuel & Loeb, P.C.*, 441 F. Supp. 2d 1227, 1230 (S.D. Fla. 2006); *Chambers v. Kay*, 29 Cal. 4th 142, 148-49, 56 P.3d 645, 649-50 (2002); *Robinson v. Thornton*, 705 So. 2d 745, 748 (La. App. 3d Cir. 1997), *writ denied,* 709 So. 2d 739 (La. 1998); *Anderson v. Anchor Org. for Health Maint.*, 274 Ill. App 3d 1001, 1011, 654 N.E.2d 675, 684 (1995).

{35} The Court concludes that any fee-sharing agreement that Dart, Zaytoun, and Dunn may have reached is not enforceable absent compliance with Rule 1.5(e), and that the failure to comply with that rule can be raised as a defense to an action

---

[47] In *Cunningham*, the defendant client raised Rule 1.5(f) as a jurisdictional challenge to the action in Superior Court because the plaintiff attorney had not exhausted the administrative fee grievance proceeding. The Court of Appeals allowed the jurisdictional challenge, finding that to "allow the plaintiff to violate a valid state bar rule to his own advantage by permitting a lawsuit to proceed despite noncompliance with those rules and regulations would completely undercut "the efficiency, effectiveness, and purpose" of the State Bar's rules. 689 S.E.2d at 529, 2009 N.C. App. LEXIS at *35-36.

to enforce fee-sharing pursuant to such an agreement. This would serve as an independent basis for summary judgment.

C. Other Asserted Grounds for the Joint Motion

{36} Having determined summary judgment on other grounds, the Court need not make a final determination as to other defenses raised, including novation and the various equitable and claim preclusion defenses. As to novation, the Court has determined that the initial agreement was itself never reached, so no question of substitution by novation occurs. However, had such an agreement been reached, the Court notes that the subsequent Supplemental Retainer Agreement expressly ratified existing individual contracts while allowing for their terms to be modified by subsequent court orders approving attorney fees.

{37} As the equitable and claim preclusion defenses, the argument is essentially that all fee disputes should have been presented to Magistrate Judge Gates and that his order is then final as to all disputes, particularly where his order was based on the representation that agreements among PMC members had been resolved. While the Court does not undertake a full analysis of these defenses, there are hurdles that would have to be overcome before the defenses could be sustained. First, the December 14, 2009 stipulation indicated that separate side agreements were removed from the special master proceeding which had been substituted for arbitration. Second, Judge Flanagan rejected the assertion that Dunn's claim was integrally tied to the federal court's fee determination.[48] However, the Court need not wrestle further with these issues in light of its ruling on other issues which allow for summary adjudication.

---

[48] The Court also need not deal in this case with the difficult question of what obligation, if any, rested on any PMC member to disclose any side agreement as a part of the fee award proceeding.

D  Dart's Alternative Individual Motion for Summary Judgment

{38} Dart argues alternatively that the claim against him should be dismissed even if the joint motion for summary judgment is denied.  In sum, Dunn argues that he would actually be entitled to more of an award than he has, in fact, received should the Court have enforced the agreement as Dunn promotes.  More specifically, he urges that interpretation would yield Dart two-thirds of the total fee award of $1,740,000, which equals approximately $1,160,000 which is in excess of the $995,000 he actually received pursuant to the allocation Magistrate Judge Gates approved.   While the individual motion is moot in light of the grant of the joint motion, the Court believes that Dart's individual position would have been well taken as a basis for the award of summary judgment in his favor.

## VI. CONCLUSION

{39} For the reasons stated, Defendants' Motion for Summary Judgment and Defendant Dart's Alternative Motion for Summary Judgment filed January 13, 2011 is GRANTED and Plaintiff's complaint is DISMISSED.

This the 14th day of July, 2011.